1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9   TAYLOR CHEAIRS

10              Plaintiff,

11       v.

12
    CITY OF SEATTLE (and its officers,
13  employees and agents), SEATTLE POLICE
    DEPARTMENT (and its officers, employees
14  and agents), and JOHN DOES 1-10
    (unidentified members of the Seattle Police
15  Department)

16
17              Defendants.

No.

**COMPLAINT FOR DAMAGES FOR
USE OF EXCESSIVE FORCE AND
VIOLATIONS OF CONSTITUTIONAL
RIGHTS**

**JURY DEMAND**

18
19                          **I.    INTRODUCTION**

20          1.1     During the year-2000 protests in Seattle against systemic racism, Taylor Cheairs

21  was severely injured and traumatized by the SPD's reckless, indiscriminate and illegal violence

22  against him when he was doing nothing more than standing on a sidewalk. Mr. Cheairs was

23  peacefully standing on a Seattle sidewalk when an unknown member of the SPD shot him

24  directly in the penis/scrotum/groin area with an exploding flash bang grenade. Mr. Cheairs

25  captured this incident on digital video. The video (together with a second video of the scene)

26

**COMPLAINT FOR BREACH OF              1**
**CONTRACT**

CARLSON LEGAL
600 First Ave., Suite LL06
Seattle, WA 98104
(206) 899-4948

shows with absolute clarity that Mr. Cheairs had taken no action whatsoever to justify a violent

assault on him by the SPD. Mr. Cheairs was severely injured and required hospital treatment for

his injuries. This was a gruesome, painful, and highly traumatic experience.

## II.  PARTIES

2.1    Plaintiff Taylor Cheairs is a United States citizen and a resident of the City of

Seattle in King County, Washington.

2.2    Defendant City of Seattle is a municipal corporation organized under the laws of

the State of Washington. The City of Seattle operates the Seattle Police Department.

2.3    The Seattle Police Department ("SPD") is the municipal police force operating

within the City of Seattle.

2.4    John Does 1-10 are individual officers employed by the Seattle Police

Department who were directly involved in the incident giving rise to this Complaint. These

individual officers have yet to be identified through discovery.

## III.  JURISDICTION AND VENUE

3.1    The Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331

because this action presents federal questions and seeks to redress the deprivation of rights

under the First and Fourth Amendments to the U.S Constitution and pursuant to 42 U.S.C. §

1983.

3.2    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because the events

giving rise to the claims took place in the Western District of Washington.

## IV.  FACTUAL ALLEGATIONS

4.1    The SPDs assault on Mr. Cheairs took place against the backdrop of the year-

2000 protests in Seattle against systemic racism, which occurred in the aftermath of the killing

**COMPLAINT FOR BREACH OF
CONTRACT**

2

of George Floyd on May 25, 2020. As has been well documented, the City of Seattle and the SPD responded to these protests using a campaign of excessive force against members of the public. This excessive force included the indiscriminate use of so-called "less lethal" military style ordinance by the SPD against peaceful protesters, including tear gas, OC spray, "blast balls," flash-bang grenades, and rubber bullets. Mr. Cheairs was but one unfortunate victim of this systematic campaign of excessive force featuring military ordinance being used by the SPD against Seattle protesters.

4.2     The background of the SPDs systematic use of excessive force against protesters is well summarized in a federal complaint filed by the Perkins Coie LLP law firm (working with the ACLU), on behalf of various Washington citizens and the Black Lives Matter-King County organization. Rather than repeat this history and background, a copy of the Complaint from matter 2:20-cv-00887 RAJ (Western District of Washington, filed on June 9, 2020) is attached as an appendix to this Complaint. It is not intended that the current defendants be compelled to formally answer the allegations contained in the appendix, as they have already done so in that pending matter. This appendix is included as a demonstrative for background reference only.

4.3     Mr. Cheairs is a 33 year old Seattle citizen. He has lived in Seattle since 1998. He works as a construction contractor, running his own licensed small business. By any measure, he is a fine and upstanding member of the community.

4.4     On or around the night of June 7, 2020, like everyone else Mr. Cheairs was aware of the ongoing protests in Seattle. While following social media and the news about the protests, Mr. Cheairs had grown alarmed by the indiscriminate violence of the SPD, led and encouraged by Seattle leadership including Mayor Jenny Durkan, towards the protesters. Mr.

**COMPLAINT FOR BREACH OF CONTRACT**

3

Cheairs therefore decided to go "see for himself" what was going on. He viewed himself as a citizen journalist in his decision to go and view the protests first hand.

4.5     A video shot by Mr. Cheairs during the events in questions shows clearly what happened. Mr. Cheairs was present at a Capitol Hill intersection (11th and Pine) where, for some reason, the SPD had massed troops deployed in what appears to be fully militarized riot gear. The crowd at that location was peaceful and was not engaged in violence towards the SPD troops. The SPD began broadcasting a series of threatening messages to the crowd in an apparent attempt to force them to move to a different location.

4.6     At the same time, and with no apparent provocation, the massed SPD troops began shooting a large amount of militarized ordinance directly into the gathered crowd of citizens. The weapons fired by the SPD included chemical weapons such as tear gas, which was fired in significant amounts directly into the crowd. The SPD also indiscriminately fired a large number of "flash bang" grenades directly into the crowd, shooting numerous citizens with these powerful flaming projectiles.

4.7     This indiscriminate violence by the SPD continued on and on. The video shows what can only be described as an organized and militarized attack by the SPD against a crowd of peacefully protesting citizens.

4.8     Mr. Cheairs never advanced towards the mass of SPD troops. He did not throw anything towards the massed troops. He never left the main group of citizens gathered at the intersection. He never shouted anything towards the massed SPD troops. He merely stood there, on the sidewalk, peacefully filming what was going on.

4.9     Then, with no provocation, one of the SPD troops -- as yet unidentified -- fired a flash bang grenade directly at Mr. Cheairs. The video clearly shows this grenade bouncing in

**COMPLAINT FOR BREACH OF CONTRACT**                    4

front of Mr. Cheairs and then striking him directly in the groin area. Mr. Cheairs rapidly moved backwards as the pain of his injuries began to set in. Again, this is all captured on video.

4.10    It quickly became clear to Mr. Cheairs that he had been severely injured by this SPD shooting. His pants were blasted apart and burned in the groin area. He realized that he was bleeding from the groin. The pain was intense. Therefore, Mr. Cheairs was compelled to travel to the emergency room at Swedish Medical Center on Capitol Hill. There, he received emergency treatment for his injuries.

4.11    Photographs taken at the hospital show the scope of Mr. Cheairs' injuries, and the condition of his clothing. Although in some photographs Mr. Cheairs covered his penis in the interests of privacy and modesty, his penis was also injured, similarly to his surrounding injuries. These photographs are difficult to look at. Mr. Cheairs does possess photographs of his uncovered private area as well, depicting the full scope of these injuries. These photographs were not produced as part of the plaintiff's Tort Claim submission to the city, but they can be produced in this case with an appropriate protective order.

4.12    The photographs and the videos mentioned above were provided to the City of Seattle with Mr. Cheairs' tort claim submission, submitted on March 26, 2021. The City's response to this submission constituted a single e-mail. The plaintiff has fully satisfied the requirements of Washington's municipal tort claim statute, RCW 4.96.020 *et seq.*

4.13    Mr. Cheairs' injuries slowly healed, but he was in severe pain and discomfort for a long period of time. His injuries negatively impacted his ability to work in his physically demanding job. The emotional distress from this incident was severe. Being shot and severely injured in the penis, scrotum and groin area is a highly upsetting injury for a person to suffer.

**COMPLAINT FOR BREACH OF CONTRACT**

5

Mr. Cheairs continues to have symptoms of PTSD resulting from this incident. He has suffered sleep disturbances and other symptoms of emotional trauma.

4.14    There is no legal defense to justify the SPD's shooting of Mr. Cheairs. The SPD's militarized attacks on protesters have already been held to be wrongful in a court of law. Indeed, on June 12, 2020, just days after this incident, a federal judge in Seattle issued a Temporary Restraining Order prohibiting the SPD from using "less lethal" crowd control ordinance such as "flash bang grenades" as a tool of crowd control. Later, the SPD was held in contempt of court for violating that federal court injunction.

4.15    Indeed, on the very day that Mr. Cheairs was later injured by an SPD-fired flash bang grenade, Mayor Jenny Durkan acknowledged that the SPD was misusing flash bang grenades and other "less lethal" ordinance against the public. On June 7, 2020 she reportedly said: "SPD's response needed to be better measured. While the accountability system will review all of the facts, the response seem too quick to escalate. Too quick to deploy of flash bangs, pepper spray and deployment of the National Guard. While officers have been working long hours under difficult conditions, de-escalation should be the number one priority for the department – and the deployment of flash bangs before using every tool to deescalate – that is what we have to do to reflect the commitment of SPD."

## V.    CAUSES OF ACTION – NOTICE PLEADING

5.1    Plaintiff brings his claims under  42 U.S.C. § 1983, which provides that any person who, under color of law, deprives another of any rights, privileges or immunities secured by the Constitution and laws of the United States shall be liable to the injured party.

5.2    The defendants acted under color of law.

**COMPLAINT FOR BREACH OF CONTRACT**                    6

5.3     Defendants violated the plaintiff's right to be free from the use of unnecessary and excessive force as guaranteed under the Fourth Amendment to the U.S. Constitution.

5.4     By their conduct the defendants deprived the plaintiff of rights and privileges guaranteed under the First Amendment to the U.S. Constitution.

5.5     The plaintiff suffered compensable damages as a result of the conduct by the defendants.

5.6     The defendants' conduct reflected the deliberate indifference to the plaintiff's various rights as guaranteed by the U.S. Constitution.

## VI.     PRAYER FOR RELIEF

Plaintiff hereby prays for and requests the following relief from this Court:

1.  For a ruling that defendants are liable to the plaintiff pursuant to 42 U.S.C. § 1983;

2.  For an award of compensable damages;

3.  For an award of punitive damages;

4.  For an award of attorney's fees and costs pursuant to 42 U.S.C. § 1983 or as otherwise authorized by applicable law;

5.  For a trial by jury of all issues so triable;

6.  For an award of other damages or relief as supported by the law and the evidence and as the Court deems just and equitable.

October 1, 2021

Respectfully submitted,

/s/_____
Jason Moore, WSBA No. 41324

**COMPLAINT FOR BREACH OF CONTRACT**

7

CARLSON LEGAL
600 First Ave., Suite LL06
Seattle, WA  98104
(206) 899-4948

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Paradigm Law
Jason@paradigmlawseattle.com
(425) 999-7562



_____

Jay S. Carlson, WSBA No. 30411
Carlson Legal
Jay@carlsonlegal.org
(206) 899-4948
Attorneys for Plaintiff Taylor Cheairs

**COMPLAINT FOR BREACH OF
CONTRACT**

8

APPENDIX

THE HONORABLE _____

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

BLACK LIVES MATTER SEATTLE-
KING COUNTY, ABIE EKENEZAR,
SHARON SAKAMOTO, MURACO
KYASHNA-TOCHA, ALEXANDER
WOLDEAB, NATHALIE GRAHAM,
AND ALEXANDRA CHEN,

             Plaintiffs,

   v.

CITY OF SEATTLE,

             Defendant.

No. 2:20-cv-887

COMPLAINT

JURY DEMAND

Plaintiffs Black Lives Matter Seattle-King County, Abie Ekenezar, Sharon Sakamoto, Muraco Kyashna-tochá, Alexander Woldeab, Nathalie Graham, and Alexandra Chen submit this Complaint against Defendant City of Seattle and allege as follows:[1]

## I.    INTRODUCTION

1.    This case is about the policy, practice, and custom of the City of Seattle (the "City") to allow the Seattle Police Department ("SPD") to deploy unnecessary violence against peaceful demonstrators who are speaking out against discriminatory police brutality.

---

[1] The articles, pictures, videos, and other online sources cited in this Complaint are best accessed by copying and pasting the cited links into a web browser.

COMPLAINT (No. ) –1

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

148463513.5

2.      Notably, Seattle Mayor Jenny Durkan and SPD Chief Carmen Best have "apologized for instances in which they said officers may have failed to deescalate tense moments, used disproportionate force against demonstrators and deployed less-than-lethal weapons too quickly."[2] Plaintiffs seek injunctive relief because their apologies have not prevented and will not prevent the City's ongoing violation of plaintiffs' constitutional rights.

3.      On May 25, 2020, George Floyd was murdered in Minneapolis, Minnesota by the police. Mr. Floyd, a Black man, was accused of a non-violent offense. During his arrest, Mr. Floyd fell to the ground, handcuffed and restrained. Minutes later, for no discernible reason, a police officer placed his knee—and the weight of his body—on Mr. Floyd's neck as Mr. Floyd lay pinned to the ground.

4.      For nearly nine excruciating minutes, the officer pressed his knee into Mr. Floyd's neck as Mr. Floyd struggled to breathe and pleaded for both mercy and his mother. Rather than allow Mr. Floyd to breathe, other officers held his legs or stood by, watching as Mr. Floyd began to die. Among Mr. Floyd's last words were, "please, please, please, I can't breathe."

5.      Mr. Floyd died at the scene, a victim of excessive use of force by the police.

6.      Mr. Floyd was not the first victim of such force. His final words echo those spoken by Eric Garner in 2014, before he died at the hands of a New York police officer who put him in a chokehold during an arrest for a non-violent offense: "I can't breathe." Like Mr. Floyd, Mr. Garner struggled to breathe as police officers at the scene watched him die.

7.      More recently, Breonna Taylor, a Black woman, was shot eight times and killed in March 2020 by three plainclothes Louisville police officers who entered her home in the middle of the night to execute a no-knock warrant.

8.      The words "I can't breathe" have become a rallying cry for those seeking racial justice and an end to discriminatory police practices.

---

[2] *Man Shot on Capitol Hill After Gunman Drives Car into George Floyd Protest*, Seattle Times (June 7, 2020), https://www.seattletimes.com/seattle-news/crime/man-shot-after-gunman-drives-car-into-capitol-hill-protesters/.

COMPLAINT (No. ) – 2

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

9.      Despite a global pandemic, groups of demonstrators throughout the country and the world, including in Seattle, have gathered to protest the systemic injustices perpetrated by law enforcement against Black people and other people of color.

10.     In response to these protests, the SPD has exercised an overwhelming and unconstitutional use of force to discourage these protesters from exercising their constitutional rights.  On an almost nightly basis, the SPD has indiscriminately used excessive force against protesters, legal observers, journalists, and medical personnel.  For example, SPD has repeatedly sprayed crowds of protesters with tear gas and other chemical irritants—including as recently as Monday, June 8, just days after the City pledged a 30-day moratorium on the use of tear gas.

11.     The City of Seattle has its own history of excessive force used by its police department against people of color.  Some of the incidents of excessive force led the City to acknowledge some of the problems after the Department of Justice investigated the City and concluded that reasonable cause existed to believe that SPD engages in a pattern or practice of using unnecessary or excessive force in violation of the Fourth Amendment to the United States Constitution and 42 U.S.C. § 14141.[3]

12.     The purpose and effect of this excessive force described in Paragraph 10 has been to restrict, frustrate, and deter protesters from exercising their rights under the First Amendment to the United States Constitution to peacefully assemble, petition for redress of grievances, exercise freedom of speech, and exercise freedom of the press—and the Fourth Amendment to be free from unwarranted seizures by the government.

13.     Plaintiffs have been, and want to continue to be, part of the protest movement to protect black lives.  They want to participate in demonstrations against police brutality in Seattle without being exposed to the less-lethal weapons regularly deployed by the SPD against

---

[3] The Settlement Agreement and Consent Decree and other supporting documents can be found here:  https://www.seattle.gov/police/about-us/professional-standards-bureau/settlement-agreement-history.

COMPLAINT (No. ) – 3

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

148463513.5

1  protesters as a method of crowd control.  Plaintiffs bring this action to restrain the City of Seattle

2  from continuing to respond to peaceful protest with unconstitutional and indiscriminate force.

3  **A.   SPD's "Less-Lethal" Weapons and "Crowd Control" Arsenal**

4  14.     The weapons SPD uses for "crowd control" purposes during demonstrations,

5  sometimes referred to as "non-lethal" weapons, are more appropriately called "less-lethal"

6  weapons, as many government entities and human rights NGOs have recognized.[4]

7  15.     The "less-lethal" weapons the SPD deployed at protests this month include

8  chemical irritants, batons, kinetic impact projectiles, and weapons intended to stun with light and

9  sound.

10  16.     The chemical irritants released on protesters by the SPD this month include tear

11  gas ("CS gas") and oleoresin capsicum spray ("OC" or "pepper" spray).

12  17.     SPD has deployed chemical irritants both by targeting specific protesters with

13  handheld devices and by launching canisters of chemical irritants into a crowd from a distance,

14  releasing the irritants indiscriminately in every direction.

15  18.     SPD has also hit protesters with batons and shot kinetic impact projectiles such as

16  rubber bullets at protesters.

17  19.     In addition, SPD has deployed flash-bang grenades and blast balls against

18  protesters.  When these weapons detonate, they generate loud noise and bright light.  Blast balls

19  also release chemical irritants.

20  20.     Tear gas can be lethal.  It is known that high-dose exposure in an enclosed space

21  can "lead to the development of airway edema, non-cardiogenic pulmonary edema, and possibly

22  respiratory arrest."[5]  Though this kind of exposure in an enclosed space is rare, more generally,

---

23

24  [4] U.S. Dep't of Just., Office of the Inspector General, Evaluation and Inspections Division, Review of the Department of Justice's Use of Less-Lethal Weapons (May 2009), https://oig.justice.gov/reports/plus/e0903/final.pdf; United Nations Guidance on Less Lethal Weapons in Law Enforcement (2020), https://www.ohchr.org/Documents/HRBodies/CCPR/LLW_Guidance.pdf.

25

26  [5] Toxic Syndrome Description, Riot Control Poisoning, Centers for Disease Control and Prevention, https://emergency.cdc.gov/agent/riotcontrol/agentpoisoning.asp.

COMPLAINT (No. ) – 4

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

148463513.5

tear gas exposure can have more severe effects on those with asthma such that it can trigger a fatal asthma attack.[6]  The death on May 30 of a 22-year-old protester in Ohio who had asthma and who passed away after being sprayed with tear gas is currently being investigated.[7]

21.     Pepper spray can be lethal.  Between 1990 and 1995, at least 61 in-custody deaths followed police use of pepper spray on suspects.[8]  A 1994 study of 63 in-custody fatalities concluded that pepper spray was a contributing cause of death in 2 cases of people with asthma.[9]  Though this study found that positional asphyxia and other causes contributed to the deaths of 61, the study cautioned that the precise role of pepper spray in the deaths could not be determined.[10]

22.     Even when not directly lethal, exposure to tear gas has been shown to increase the risk of developing acute respiratory illnesses.  A study conducted in 2012 of 6,723 U.S. Army recruits demonstrated that recruits who were exposed to tear gas had a significantly higher chance of getting an acute respiratory illness such as influenza, bronchitis, and pneumonia than those recruits who weren't exposed.[11]

**B.     Heightened Risks of COVID-19 Transmission from Less-Lethal Weapons**

23.     People who have been exposed to chemical irritants are more vulnerable to COVID-19, an acute respiratory illness.

---

[6] How Tear Gas and Pepper Spray Affect the Body, Healthline, https://www.healthline.com/health-news/how-tear-gas-and-pepper-spray-affect-the-body#What-to-know-about-tear-gas.
[7] Jim Letizia, Columbus Investigating Claims Protester Died After Being Exposed to Tear Gas, https://www.wcbe.org/post/columbus-investigating-claims-protestor-died-after-being-exposed-tear-gas.
[8] Mark I. Pinsky, If Pepper Spray Isn't Lethal, Why All the Deaths?, L.A. Times (June 18, 1995), https://www.latimes.com/archives/la-xpm-1995-06-18-mn-14572-story.html.
[9] Office of Justice Programs, U.S. Dep't of Just., The Effectiveness and Safety of Pepper Spray (Apr. 2003), https://www.ncjrs.gov/pdffiles1/nij/195739.pdf.
[10] Id. at 11.
[11] Joseph J. Hout, et al., o-Chlorobenzylidene Malonotrile (CS Riot Control Agent) Associated Acute Respiratory Illnesses in a U.S. Army Basic Combat Training Cohort, 179 Military Medicine 7:793 (2014), https://academic.oup.com/milmed/article/179/7/793/4259353#101149356.

COMPLAINT (No. ) – 5

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1        24.     When people with COVID-19 are exposed to chemical irritants during a

2   demonstration, this exposure may also increase the likelihood that COVID-19 will spread to

3   other people because of the immediate effect both tear gas and pepper spray have on those who

4   are exposed.  By design, part of the incapacitating effect of tear gas and pepper spray is that both

5   can cause lung irritation that makes you cough, spit, and/or vomit.[12]  In addition, people exposed

6   to tear gas or pepper spray suffer from eye irritation that leads them to rub their eyes.  Coughing,

7   spitting, vomiting, and rubbing eyes can all lead to the spread of viruses.

8        25.     A petition signed by over 2,000 health professionals—led by doctors at the

9   University of Washington—expresses precisely these concerns.[13]  Infectious disease physician

10  Rachel Bender Ignacio states, "Exposure to chemical irritants certainly makes the airways more

11  susceptible to infection . . . .  If people are coughing from any of these chemical irritants, then

12  that increases their risk of spreading [COVID-19] to fellow protesters and to law enforcement as

13  well."[14]

14       26.     Indeed, Dr. Jeffrey Duchin, the head of King County Public Health Department,

15  has publicly denounced the use of "respiratory irritants" like tear gas as a crowd control method

16  because of the "potential to increase COVID-19 spread."[15]

17

18

19

20      [12] Facts About Riot Control Agents Interim Document, Centers for Disease Control and
    Prevention, https://emergency.cdc.gov/agent/riotcontrol/factsheet.asp.
21      [13] Open letter advocating for an anti-racist public health response to demonstrations
    against systemic injustice occurring during the COVID-19 pandemic, available at
22  https://drive.google.com/file/d/1Jyfn4Wd2i6bRi12ePghMHtX3ys1b7K1A/view (last visited June
    7, 2020).  *See also* John Ryan, Quit the Tear Gas, Doctors Tell Cops.  It Might Exacerbate the
23  Pandemic, KUOW (June 4, 2020), https://www.kuow.org/stories/disease-specialists-to-cops-
    stop-the-tear-gas.
24      [14] John Ryan, *Quit the Tear Gas, Doctors Tell Cops.  It Might Exacerbate the Pandemic*,
    KUOW (June 4, 2020), https://www.kuow.org/stories/disease-specialists-to-cops-stop-the-tear-
25  gas.
        [15] Alex Bartick, *Mayor Durkan Announces Temporary Ban on the Use of Tear Gas by
26  SPD at Demonstrations*, KOMO News (June 5, 2020) (quoting Dr. Jeffrey Duchin of Public
    Health, Seattle and King County).

COMPLAINT (No. ) – 6

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

148463513.5

27. The use of other less-lethal weapons that cause panic and injury also create the potential for increased COVID-19 spread by compressing large groups of people as protesters and bystanders attempt to flee from the use of force.

28. Seeking medical care for injuries caused by police presents another opportunity for COVID-19 spread, as injured people and people delivering medical care come into close physical contact with one another.

## II.   PARTIES

29. Each of the Plaintiffs wishes to participate in demonstrations against police brutality without being subject to less-lethal force by the SPD.  Without an injunction restraining the City from using less-lethal force to control protesters, each of these Plaintiffs will be forced to choose between exercising their constitutional rights and avoiding exposure to dangerous less-lethal weapons.

30. Plaintiff Black Lives Matter Seattle-King County is a nonprofit organization operating in Seattle, Washington.

31. Plaintiff Abie Ekenezar is a Washington resident who attended protests every day from May 29 through June 6, 2020, either in Seattle or Tacoma.

32. Plaintiff Sharon Sakamoto is a Washington resident who would like to attend the Seattle protests but has not done so out of fear from the negative health effects of tear gas and other chemical agents the SPD has been deploying.

33. Plaintiff Muraco Kyashna-tochá is a Washington resident who attended protests in Seattle every day from May 29 through June 6, 2020.

34. Plaintiff Alexander Woldeab is a Washington resident who attended protests in Seattle every day from May 30 through June 6, 2020, except for June 4.

35. Plaintiff Alexandra Chen is a Washington resident who attended protests in Seattle on May 30, 2020, and June 1 through June 6, 2020.

COMPLAINT (No. ) – 7

148463513.5

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

36.     Defendant the City of Seattle ("the City") is a municipality incorporated in the State of Washington.

### III.     JURISDICTION AND VENUE

37.     The Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331 because this action presents federal questions and seeks to redress the deprivation of rights under the First and Fourth Amendment to the U.S. Constitution and pursuant to 42 U.S.C. § 1983.

38.     Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because the events giving rise to the claims took place in the Western District of Washington.

### IV.     FACTUAL ALLEGATIONS

**A.     Protesters Demonstrating against Police Brutality Are Met with Brutality by the SPD**

39.     After the killing of George Floyd, demonstrators began to gather around the City of Seattle on a daily and nightly basis to protest police brutality against Black Americans.

40.     With limited exceptions, these protesters have been overwhelmingly peaceful. But nearly every night, City law enforcement tactics to deter these protests have escalated in severity.  The SPD arrested protesters and used force on many others who were not arrested. SPD has hit protesters with batons and shot them with rubber bullets, released chemical irritants, and thrown "blast balls" and flash-bang grenades into crowds, often with little or no warning.

41.     SPD's actions have been consistent with the directive of a State trooper deployed with the SPD:  don't "kill" protesters but "hit them hard."[16]

42.     Simply put, in response to protests *against* police brutality, the police chose to *engage* in brutality.

---

[16]     *Washington State Patrol apologizes for officer's 'Don't kill them, but hit them hard' instruction regarding Seattle protesters*, Seattle Times (June 3, 2020), https://www.seattletimes.com/seattle-news/washington-state-patrol-apologizes-after-officer-tells-his-team-dont-kill-them-but-hit-them-hard-in-reference-to-seattle-protesters/ (with embedded video).

COMPLAINT (No. ) – 8

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

148463513.5

**B.     Timeline of Excessive Police Force at Protests**

43.     On Friday, May 29, the first day of protests in Seattle, SPD officers in riot gear responded to protesters by deploying chemical irritants and flash-bang devices to disperse crowds and arresting others.[17]

44.     On Saturday, May 30, SPD officers continued their use of chemical irritants and flash-bang devices on protesters and engaged in other violent tactics, including pepper-spraying a child and punching a man as he was being held on the ground.[18]

45.     The violence by SPD continued as the weekend wore on.  On Sunday, May 31, the SPD again deployed flash-bang devices, OC spray, and blast balls against protesters and militarized the streets of downtown Seattle.[19]

46.     In response to police brutality during the first weekend of protests (May 29-31), the Seattle Office of Police Accountability received about 12,000 individual complaints of

---

[17]     *Sparked by death of George Floyd, Seattle protestors clash with police*, Seattle Times (May 29, 2020), https://www.seattletimes.com/seattle-news/protesters-break-windows-clash-with-police-in-downtown-seattle/.

[18]     *Seattle Protest Updates:  The city reacts to the death of George Floyd*, Seattle Times (May 30, 2020), https://www.seattletimes.com/seattle-news/protest-updates-as-the-country-reacts-to-the-death-of-george-floyd-follow-the-latest-developments-in-seattle-and-elsewhere/ (SPD "faced questions for its tactics, including the use of flash bangs as it dispersed people Saturday, and for a videotaped incident Friday night of at least one officer punching a man as he was held on the ground"); *Seattle mayor, police face questions over response to George Floyd protests, downtown turmoil*, Seattle Times (May 30, 2020), https://www.seattletimes.com/seattle-news/politics/seattle-mayor-police-face-questions-over-response-to-george-floyd-protests-downtown-turmoil/ ("Durkan and Police Chief Carmen Best faced questions over the city's response to the turmoil, as some nonviolent protesters described escalations by officers early in the afternoon" including multiple reports that "officers would throw a flash bang or tear gas just randomly into the crowd" and that officers without warning shot pepper spray into the faces of protesters, including a young girl).

[19]     Lynda V. Mapes, *Seattle demonstrations vent anguish at death of George Floyd and more, for a 'grieving nation'* Seattle Times (May 31, 2020), https://www.seattletimes.com/seattle-news/seattle-demonstrations-vent-anguish-at-death-of-george-floyd-and-more-for-a-grieving-nation/ ("There were a couple of tense moments, with police setting off flash bangs and pepper spray on Fourth Avenue, but the protests were mostly peaceful as of Sunday evening"); *see also Seattle area protest updates:  City reacts to George Floyd killing, Bellevue imposes curfew amid protests*, Seattle Times (May 31, 2020), https://www.seattletimes.com/seattle-news/seattle-protest-updates-on-day-2-of-curfew-the-city-reacts-to-the-death-of-george-floyd/.

COMPLAINT (No. ) – 9

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

abusive conduct by SPD.  For all of 2019, the Office of Police Accountability received just 928 complaints.[20]

47.     Among the ten most common incidents reported in these complaints are "[p]epper spraying a young girl"; "[p]epper spraying peaceful protesters"; and "[t]he use of flash-bangs, including causing a significant thumb injury."[21]

48.     On Monday, June 1, SPD unleashed tear gas, OC spray, and blast balls on largely peaceful protesters in Capitol Hill after failing to give dispersal orders to allow for protesters to leave the area.[22]

49.     Video shows police escalating the confrontation by grabbing a protester's umbrella just before deploying chemical irritants into the crowd.[23]

50.     On Tuesday, June 2, SPD followed the same playbook, again deploying tear gas, OC spray, blast balls, flash-bang grenades, and rubber bullets, causing protesters to flee in fear.[24]

51.     The SPD's tactics have been so excessive that the City's own director for the Office of Civil Rights, Mariko Lockhart, wrote an open letter stating that she had "heard from other City leadership and employees that they fear for their personal safety, not because of other

---

[20] *See* Seattle Office of Police Accountability, Office of Police Accountability processing 12,000 complaints after weekend demonstrations (June 1, 2020), http://www.seattle.gov/Documents/Departments/OPA/PressReleases/06-01-20_OPA-Press-Release-Following-Demonstrations.pdf.

[21] *Id.*

[22] *Seattle area protests:  Police declare a riot as demonstrators gather for fourth day to call for police accountability*, Seattle Times (June 1, 2020), https://www.seattletimes.com/seattle-news/george-floyd-protests-continue-in-seattle-area-demonstrators-expected-to-gather-for-fourth-day-to-call-for-racial-justice/ ("videos of the officers spraying the crowd and deploying flash bangs quickly spread on social media; many of those who shared them said the footage showed the police were escalating the confrontation").

[23] *See id.* ("[a] police officer at the front of the crowd can be seen grabbing a protester's umbrella just before other officers deploy pepper spray into the crowd"); Declaration of Omari Salisbury ("Salisbury Decl.") ¶ 3 (June 1 video).

[24] *See* Salisbury Decl. ¶ 4 (June 2 video starting at 0:04:00); Seattle Police Department Blotter, Timelines of Police Responses to Demonstrations (June 7, 2020 1:51 p.m.), https://spdblotter.seattle.gov/2020/06/07/timelines-of-police-responses-to-demonstrations/ (stating that SPD used pepper spray, blast balls, flash-bangs, and tear gas at 11:36 p.m.).

COMPLAINT (No. ) – 10

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

148463513.5

1   protesters but because of the police."[25] Ms. Lockhart went on to call for the City to immediately

2   "[c]ease the use of flash grenades, rubber bullets, and tear gas against community protesters."

3       52.     Those excessive tactics have also led to condemnation by many City, County, and

4   State elected officials.  In fact, on June 7, over two dozen leaders signed an open letter

5   condemning "the police tactics used in daily protests," and made clear they are "concerned that

6   the response of the Seattle Police Department (SPD) is escalating the conflict in the streets of

7   Seattle, particularly in Capitol Hill and in communities of color, with their inappropriate use of

8   force."[26]

9       53.     This letter urges the City "to change [its] tactics," and makes clear that "continued

10  violence by the police will only polarize this necessary conversation in unproductive ways," and

11  "to end the damage that SPD has caused by overreaction to mostly peaceful protests."[27]  The

12  letter goes on to make the following observations about the harmful effects of SPD's use of force

13  against protesters:

14          This harms the relationship between law enforcement and the
            community, harms our city, and harms law enforcement officers
15          and their families in the form of emotional trauma.  Physical
            violence is being perpetrated against members of our community
16          by SPD.  Emotional trauma and extraordinary racial aggression is
            being inflicted.  Constitutional rights are at risk.  Police tactics are
17          exacerbating health risks amidst a devastating respiratory
            pandemic.  The public health crisis of law enforcement anti-black
18          violence is so extreme as to have eclipsed the previous disease that
            gripped our city.
19
20          It is well-documented that peaceful protests are being targeted by
            law enforcement and turned into violent conflict.  No amount of
21          secondary illegal activity has happened that warrants this response.
            We will have time in the future to discuss necessary reforms for
22          future such conflicts, but for now, the violence must stop.
            Deploying police in riot gear to form a wall of officers positioned
23
    _____
24      [25] Letter from M. Lockhart to Seattle Office of Civil Rights (June 5, 2020), *available at*
    https://www.documentcloud.org/documents/6938155-Lockhart-Letter.html.
25      [26] Chase Burns, *Washington Electeds to Mayor Durkan and Chief Best:  Direct SPD to
    "Change Their Tactics Immediately,"* The Stranger (June 7, 2020), *available at*
    thestranger.com/slog/2020/06/07/43862996/seattle-electeds-to-mayor-durkan-and-chief-best-
26  direct-spd-to-change-their-tactics-immediately (last viewed June 7, 2020).
        [27] *Id.*

COMPLAINT (No. ) – 11

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1    against peaceful protesters is not conducive to de-escalation and
2    healing; a moratorium on tear gas that is then replaced with pepper
     spray is not de-escalation.[28]

3    54.    The letter is signed by Seattle City Councilmembers Lorena Gonzalez, Teresa

4    Mosqueda, Tammy Morales, and Lisa Herbold, and they are joined by King County

5    Councilmembers Girmay Zahilay, Joe McDermott, and Rod Dembowski and several state

6    legislators.

7    55.    A majority of the Seattle City Council has come out against SPD's tactics and use

8    of force against protesters.

9    56.    The backlash from the public and from local leaders is no surprise because it is

10   apparent from the extensive available video footage of the protests that the SPD is not using less-

11   lethal weapons out of a need to defend themselves or others against imminent harm, or even to

12   prevent significant property damage.  Instead, the City is using these tools and tactics to suppress

13   demonstrations against the police.

14   57.    On Saturday, June 6, 2020, police repeatedly deployed flash-bang grenades and

15   pepper spray canisters against protesters, including a protester in a wheelchair.[29]

16   58.    The SPD's attacks on those documenting the protests is not limited to protesters.

17   In fact, accredited journalists have also reported being gassed or subjected to flash-bang devices

18   by the SPD simply for being present and documenting the protest for the public.  For instance, on

19   June 1, and NBC News correspondent, Jo Ling Kent, was live on air when she was hit by a flash-

20   bang grenade fired by the SPD.[30]  That same reporter recalled that "[s]everal people were hit

21   with rubber bullets in the arm, in the back and in the head."[31]

---

[28] *Id.*
[29] *See* Salisbury Decl. ¶ 5 (June 6 video).
[30] A video of this incident is available online.  *See* Maura Hohman, *NBC News' Jo Ling Kent hit by flash-bang grenade at Seattle protest live on air*, Today.com (June 2, 2020), *available at* https://www.today.com/news/nbc-news-jo-ling-kent-hit-flash-bang-grenade-seattle-t183067 (last visited June 7, 2020).
[31] *Id.*

COMPLAINT (No. ) – 12

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

59.     On June 6, a KOMO news reporter was hit in the leg with a flash-bang as he was reporting from the front of a protest in Capitol Hill.  According to his account, before the police began using "flash bangs to disperse the crowd," the "[p]rotesters hadn't thrown or done anything it seems to provoke this [police reaction]."[32]

60.     Eyewitnesses have reported that SPD has also appeared to target medics on site to provide medical assistance to injured protesters.

61.     On June 6, one medic was wearing a shirt that clearly and objectively identified him as a medical professional on the scene to assist protesters with medical issues.  This medic was repeatedly targeted with blast balls and OC spray, preventing him from administering medical assistance to those affected by the SPD's unconstitutional use of this weapon.

C.      SPD's Claimed Voluntary Ban on Tear Gas

62.     On Friday, June 5, 2020, Seattle Mayor Jenny Durkan and SPD Chief Carmen Best jointly announced that SPD would stop using tear gas on protesters for the next 30 days.[33] The City made clear that this "temporary ban only applies to tear gas" and that SPD would continue to use "flash-bang grenades, pepper spray and other crowd-control tools and tactics."[34]

63.     On Saturday, June 6, the SPD responded to a peaceful protest in the Seattle neighborhood of Capitol Hill by unleashing violence to disperse protesters exercising their constitutional rights.  The SPD did so by throwing blast balls and canisters of OC spray at the crowd to indiscriminately gas the entire crowd.

64.     Various videos of the incident show that the police began throwing blast balls and gas into the crowd not because of any imminent threat to their public safety, but because they wanted a large crowd to collectively move back five feet.  Setting aside the logistical

---

[32] Cole Miller (KOMO News), Twitter (June 6, 2020 7:41 p.m.), https://twitter.com/ColeMillerTV/status/1269459358288494592.
[33] *See* Lewis Kamb and Daniel Beekman, *Seattle mayor, police chief agree to ban use of tear gas on protesters amid ongoing demonstrations*, Seattle Times (June 5, 2020), *available at* https://www.seattletimes.com/seattle-news/watchdog-groups-to-seattles-mayor-and-police-chief-spd-should-stop-using-tear-gas-on-demonstrators/ (last visited June 7, 2020).
[34] *Id.*

COMPLAINT (No. ) – 13

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

impossibility of having a large crowd move back together five feet, the protesters' overall delay or reluctance in moving back did not justify the gratuitous and excessive force that the police employed. The police faced no threat of physical harm to themselves, others, or property.[35]

65.     On June 7, Chief Best did not disavow the extreme police violence of June 6, responding only that SPD would be considering changes to its "footprint," "format," and "posture."[36]

66.     On Sunday, June 7, the City broke its own voluntary 30-day ban on tear gas, two days after announcing it. Sunday night and into the early morning on Monday, June 8, SPD made heavy use of flash-bang grenades and canisters of tear gas and OC spray to suppress a demonstration near 11th Avenue and Pine Street.[37]

**D.     The City's Illegal Actions Caused and Are Causing Injuries to Plaintiffs**

67.     The City has all but acknowledged SPD's use of excessive force against protesters: on June 4, the City withdrew its motion asking Judge James L. Robart to find SPD in compliance with its constitutional-policing mandates in a 2012 consent decree with the federal government.

68.     Plaintiffs have suffered and will continue to suffer injury as described below unless and until SPD's unlawful conduct is enjoined.

---

[35] For videos of this incident, see Chase Burns and Rich Smith, *SPD Disperses Crowd with Blast Balls, "Chemical Agents," on Eighth Day of Protests Against Police Brutality*, https://www.thestranger.com/slog/2020/06/06/43857405/spd-disperses-crowd-with-blast-balls-chemical-agents-pepper-spray-on-eight-day-of-protests-against-police-brutality (last visited June 7, 2020).
[36] Press Conference with SPD Chief Carmen Best at 1:06, June 7, 2020, https://www.facebook.com/Q13FOX/videos/252009629404175/.
[37] *See* Salisbury Decl. ¶ 6 (June 7 video, starting at 1:29:00); Seattle Police Department, Twitter (June 7, 2020, 12:18 a.m.), https://twitter.com/SeattlePD/status/1269891637448019968; Jemima McEvoy, *Seattle Police Use Tear Gas Against Protestors Despite City Ban*, Forbes (June 8, 2020), available at https://www.forbes.com/sites/jemimamcevoy/2020/06/08/seattle-police-use-tear-gas-against-protestors-despite-city-ban/#791c43415b4b.

COMPLAINT (No. ) – 14

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

69.     Demonstrations protesting police brutality and the killing of Black people in America are planned to continue this week, including a statewide general strike and silent march on Friday, June 12.

70.     Without an injunction restraining their unconstitutional use of force, SPD will continue to deploy the same abusive and illegal tactics it has deployed over the last ten days, threatening the constitutional rights and physical safety of Plaintiffs and others who have been, and will continue to be, harmed by SPD's protest response tactics.

### 1.     Black Lives Matter Seattle-King County

71.     Black Lives Matter Seattle-King County ("BLMSKC") is a grassroots nonprofit organization focused on the empowerment and liberation of Black people and other people of color through advocacy and direct action.

72.     Until recently, BLMSKC has not called on its members to join Seattle protests because of the heightened risk to communities of color from COVID-19.  But many of BLMSKC issued a "Protestor Safety Guide" to assist those who wished to participate in protests notwithstanding the potential health risks.[38]

73.     BLMSKC's safety guide cautions protesters to "[p]repare for pepper spray, mace, and tear gas."[39] BLMSKC's leaders are aware that the use of chemical agents like tear gas and OC spray may increase susceptibility to, and spread of, COVID-19.  This concern about the heightened danger that the use of chemical agents presented to protesters was one of the reasons that had led its leaders to not call on its members to join Seattle protests to this point.

74.     BLMSKC has called for a general strike and silent march in Seattle on Friday, June 12.[40]

---

[38]     Black Lives Seattle, Protestor Safety Guide, https://blacklivesseattle.org/protest-safety-guide/.
[39]     Black Lives Seattle, Protestor Safety Guide, https://blacklivesseattle.org/protest-safety-guide/.
[40]     *E.g.*, Rich Smith, *Black Lives Matter Seattle Calls for a Statewide Silent March Friday*, The Stranger (June 6, 2020),

COMPLAINT (No. ) – 15

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

75.     BLMSKC aims to reduce the threat of COVID-19 transmission by encouraging protesters to remain silent.  BLMSKC hopes that police will be less likely to deploy weapons against marchers who are exercising their right to express themselves symbolically rather than vocally.

76.     BLMSKC's leaders and members nonetheless fear that law enforcement will meet future protests with continued violence.

77.     The time and effort BLMSKC has expended due to the City's conduct has reduced its capacity to plan events and programming consistent with its mission, curtailing the organization's capacity to fulfill its mission of effecting community change through peaceful demonstrations.

78.     Two of BLM's board members participated in Seattle protests this month when SPD used OC spray, and they experienced the negative effects of it.  BLM has called on SPD to stop its use of all chemical agents in response to protesters.

**2.     Abie Ekenezar**

79.     Abie Ekenezar is a veteran of the United States Army and works at the Department of Veterans Affairs.

80.     Ms. Ekenezar has asthma and a spinal disability.

81.     On May 30 and June 6, Ms. Ekenezar joined the protests in Seattle against police brutality.

82.     Her spinal disability required her at times to use a knee scooter while protesting, which limits her mobility.

83.     During the protest on the evening of May 30, Ms. Ekenezar was peacefully protesting—alongside other peaceful protesters—when SPD officers unleashed a chemical agent

---

https://www.thestranger.com/slog/2020/06/06/43857190/black-lives-matter-seattle-calls-for-a-statewide-silent-march-friday.

COMPLAINT (No. ) – 16

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

148463513.5

on the crowd, including on Ms. Ekenezar.  The dispersal of the chemical agent was not localized and went far beyond the immediate area where it was deployed.

84.     During her time serving in the military, Ms. Ekenezar participated in tear-gas drills and is familiar with the effects of tear gas.  Based on that experience, she believes that the chemical agent the SPD used on her and other protesters on May 30 was tear gas.

85.     The tear gas stung Ms. Ekenezar's eyes and triggered her asthma.

86.     SPD officers also deployed flash-bang grenades in Ms. Ekenezar's presence at the Westlake protest on May 30.  Ms. Ekenezar also saw an SPD officer use mace on a young girl at the protest.

87.     On June 6, Ms. Ekenezar participated in the Capitol Hill protest against police brutality.

88.     Although protesters were being peaceful, SPD started asking protesters to move back from the police barricade.  Because the crowd was large, people could not move back.

89.     The chemical agent again stung Ms. Ekenezar's eyes and caused them to water.  It also caused Ms. Ekenezar to develop a cough that lasted at least through the following day.

90.     Ms. Ekenezar plans to attend other protests scheduled in Seattle this week, and she is worried not only about again being subjected to chemical agents deployed by the SPD or others acting at its direction but also about being unable to escape the police brutality because of her limited mobility.

**3.     Sharon Sakamoto**

91.      Sharon Sakamoto is a Japanese American woman who survived internment as a child during World War II.

92.     Because of her history as a survivor of internment and deep racial hostility, Ms. Sakamoto is deeply committed to advancing civil rights and racial justice.

93.     Ms. Sakamoto is a retired attorney who provided community services and legal aid primarily to the underserved Japanese American community.

COMPLAINT (No. ) – 17

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

148463513.5

94.     Ms. Sakamoto had planned to participate in the recent Seattle protests—even in light of the COVID-19 public-health crisis—but decided not to once she learned of SPD's use of chemical irritants.

95.     Ms. Sakamoto was frightened away from joining the protests because of the SPD's use of violence against the protesters in Seattle.

96.     If SPD stopped its use of tear gas, OC spray, blast balls, and flash-bang grenades, Ms. Sakamoto would attend a protest.

**4.     Alexander Woldeab**

97.     Alexander Woldeab is a videographer, graphic designer, and Seattle resident.

98.     Mr. Woldeab has joined the protests against police brutality in Seattle every day from May 30 through June 6.

99.     On May 30, Mr. Woldeab participated in the protest at Westlake in downtown Seattle.  He and his partner arrived at the protest at about 3:00 p.m. and joined the peaceful protest organized by Not This Time and Andre Taylor, whose brother Che Taylor was killed by SPD officers in 2016.

100.     At about 3:45 p.m., Mr. Woldeab heard loud sounds that he understood to be flash-bang grenades.

101.     A few minutes later, as Mr. Woldeab and other protesters were walking with their hands up and peacefully chanting "hands up, don't shoot," the SPD deployed tear gas.

102.     Mr. Woldeab experienced burning eyes and shortness of breath from the tear gas.

103.     On June 1, Mr. Woldeab and his partner again joined one of the protests in Seattle, this time in the Capitol Hill neighborhood.

104.     At about 9:00 p.m. that evening, as Mr. Woldeab and his partner were returning to the area near SPD's police barricade, they were immediately met with flash-bang grenades and tear gas.  Mr. Woldeab received no warning that SPD was going to deploy those weapons.

COMPLAINT (No. ) – 18

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

148463513.5

105.    The tear gas caused Mr. Woldeab to temporarily lose his sight and feel like he was suffocating.  Shortly after the incident, Mr. Woldeab and his partner were able to make their way to an aid table where a civil medic doused their eyes with milk and water.

106.    On June 2, Mr. Woldeab again attended the protest in the Capitol Hill neighborhood.  That evening, he witnessed the SPD again use flash-bang grenades and tear gas against protesters.

107.    Despite being subjected to chemical agents and flash-bang grenades by the SPD and experiencing significant anxiety as a result, Mr. Woldeab plans to join in the upcoming Seattle protests about police brutality.

**5.    Muraco Kyashna-tochá**

108.    Muraco Kyashna-tochá is a 60-year-old woman who participated in the protests every day from May 30 through June 6.

109.    On June 1, Ms. Kyashna-tochá attended a protest in the Capitol Hill neighborhood in which she went to the front of the police barricade created by law enforcement.  From her vantage point, the protests appeared peaceful and non-violent.

110.    At about 9:00 p.m. that evening, SPD officers began using OC spray on the crowd, including Ms. Kyashna-tochá.  Police also deployed flash-bang grenades and tear gas.

111.    Ms. Kyashna-tochá did not hear the officers issue any verbal warnings that they planned to deploy chemical irritants.

112.    The chemical irritants affected Ms. Kyashna-tochá's sight and required her to seek medical attention in an area of the protest informally designated for medical assistance.  She had to immediately remove her mask that she was wearing to protect against COVID-19, as it was soaked in OC spray.  She had to take a two-hour shower when she returned home that night to get the irritants off her body.

COMPLAINT (No. ) – 19

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

148463513.5

113.    Ms. Kyashna-tochá has participated in over 100 protests, but she has never participated in a protest in which the police deployed chemical irritants without first warning the crowd.

114.    Ms. Kyashna-tochá plans to protest police brutality again in Seattle.

**6.    Alexandra Chen**

115.    Alexandra Chen is a first-year student at Seattle University School of Law and lives in the Capitol Hill neighborhood of Seattle.

116.    Ms. Chen attended a protest in downtown Seattle in the afternoon on Saturday, May 30 and was subject to SPD's use of tear gas.

117.    Ms. Chen was marching along with other protesters when the group stopped in front of the SPD headquarters at the intersection of Fifth Avenue and Cherry Street.

118.    Although Ms. Chen estimates approximately five to ten of the group of hundreds was throwing objects like water bottles at the police line in front of SPD headquarters, the rest of the protesters were peaceful and calm.

119.    SPD deployed flash-bang grenades at the group, causing protesters to panic and flee in fear.  Ms. Chen slipped twice while trying to flee the grenades.

120.    About 30 seconds later, the SPD deployed tear gas.  The tear gas caused her eyes and skin to burn, and she had trouble seeing and breathing.  The gas became trapped under the mask Ms. Chen was wearing to protect against exposure to COVID-19, causing even greater irritation to her skin.  Ms. Chen located an off-duty medic who flushed her eyes with saline solution.

121.    Ms. Chen experienced some form of skin irritation for several days.

122.    Ms. Chen did not hear the SPD give any dispersal order or warning that they would be deploying weapons against the crowd.

COMPLAINT (No. ) – 20

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

123.    On June 1, Ms. Chen joined the protest in the Capitol Hill neighborhood. Because she feared being gassed again by the SPD, she did not participate at the front of the protest near the police barricade.

124.    The SPD again deployed flash-bang grenades and tear gas. Ms. Chen again experienced effects from the tear gas, including burning eyes and skin irritation.

125.    After she heard that the SPD again deployed chemical agents and flash-bang grenades on protesters the night of June 6, she headed to the protest scene to stand in solidarity with other protesters. She arrived about 15 minutes after the SPD released a chemical agent and saw protesters coughing and in great discomfort.

126.    Although Ms. Chen's anxiety about protesting has increased because of the SPD's actions, Ms. Chen plans to continue joining the protests against police brutality in Seattle.

**7.    Nathalie Graham**

127.    Nathalie Graham is a journalist with *The Stranger*.

128.    On May 30, Ms. Graham "saw a group of protesters peacefully kneeling in the intersection as a speaker addressed them," but the police used so much tear gas up the street that these protesters who "had been completely peaceful," were "also impacted by the tear gas." Declaration of Nathalie Graham ("Graham Decl."), ¶ 4. Ms. Graham wanted to continue reporting, but the gas was so powerful she had to leave the scene. *Id.* That same day, she observed law enforcement throw a flash-bang grenade into a crowd without warning and with no provocation. *Id.* at ¶ 6.

129.    Ms. Graham was "shocked and frightened by the consistently unprovoked, aggressive use of force by law enforcement officers on multiple different groups of peaceful protesters." *Id.* at ¶ 8. She "saw no evidence that any of these severe crowd-dispersal tactics were warranted, and there was never any warning before they were deployed." She had to stop reporting on the scene because she feared for her safety—not because of the protesters, but because of the police tactics being deployed *against* the protesters. *Id.* at ¶ 9. "There was tear

COMPLAINT (No. ) – 21

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1  gas everywhere, flash-bang grenades exploding in the street, and I was anxious that the police

2  would further escalate their tactics." *Id.*

3      130.   A similar incident occurred on June 2, 2020, when Ms. Graham was trying to

4  report on the unfolding scene at 11th and Pine.  The sheer amount of gas that the SPD deployed

5  against the peaceful protesters forced her to retreat to *The Stranger's* office and close the

6  windows.  "The ground below was so immersed in gas that [she] couldn't see the road.  Some of

7  it began to seep in to [her] office, despite the closed windows, and [she] began to cough."

8      131.   The City's actions have had a profound impact on Ms. Graham's role as a

9  journalist.  "Witnessing the aggressive, indiscriminate deployment of chemical agents and flash-

10  bang grenades by police at these protests has made me reconsider how I approach my

11  assignments.  There is a new element of trepidation, anxiety, and fear to my experience of being

12  a journalist.  I am determined to assert my rights and do my job, so I will continue reporting—

13  but I would not be surprised if other journalists felt that their ability report from the ground was

14  significantly impaired by these law enforcement tactics.  They are deeply disturbing."

15  **E.      The City's Policy, Practice, and Custom**

16      132.   The violations of Plaintiffs' First and Fourth Amendment rights are a direct result

17  of the City's policy, practice, and custom of authorizing SPD to use less-lethal weapons to

18  control and suppress protests.

19      133.   Mayor Jenny Durkan and Police Chief Carmen Best are final decision-makers

20  with respect to authorization of the use of force against protesters.

21      134.   SPD policymakers including Mayor Durkan and Chief Best have acted with

22  deliberate indifference to the constitutional rights of protesters and would-be protesters by

23  authorizing, both explicitly and implicitly, the use of less-lethal force against protesters who do

24  not pose any safety threat; by failing to properly train, supervise, and discipline SPD officers

25  regarding appropriate use of force against protesters; and by failing to rectify the SPD's

26  unconstitutional custom of using less-lethal force to control and suppress demonstrations.

COMPLAINT (No. ) – 22

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone: 206.359.8000
Fax:  206.359.9000

148463513.5

135.     After the killing of George Floyd, both Mayor Durkan and Chief Best have publicly authorized the use of less-lethal force for "crowd control" at protests.

136.     Both Mayor Durkan and Chief Best have received ample notice that the SPD is using less-lethal force against protesters to control and suppress demonstrations in the absence of any imminent threat to safety, including 12,000 complaints about the SPD in one weekend, condemnation from City Council members, and widely publicized videos and firsthand accounts circulated through the local, state, and international press.

137.     Despite receiving ample notice that SPD officers were using less-lethal force to control and suppress demonstrations in the absence of any immediate threat to safety, Mayor Durkan and Chief Best failed to take action sufficient to remedy the ongoing violations of protesters' constitutional rights by SPD officers, including by failing to train, supervise, or discipline SPD officers or issue corrective policies to prevent further violations.

138.     They have continued to authorize the use of less-lethal force to control demonstrations even while acknowledging that the majority of protesters have been peaceful. On May 31, for example, Mayor Durkan noted that "[f]or most of [May 30], people came and they were peaceful as they expressed their grief, as they built community, as they expressed their anger and demanded greater justice."

139.     In addition, Mayor Durkan and Chief Best, in apologizing for the conduct of SPD officers, as much as admitted that officers "used disproportionate force against demonstrators and deployed less-than-lethal weapons too quickly."[41]

## V.     FIRST CAUSE OF ACTION

*Violation of the First Amendment*

140.     The City's policy, practice, and custom of using less-lethal weapons to control and suppress demonstrations has deprived Plaintiffs of their rights under the First Amendment to

---

[41] *Man Shot on Capitol Hill After Gunman Drives Car into George Floyd Protest*, Seattle Times (June 7, 2020), https://www.seattletimes.com/seattle-news/crime/man-shot-after-gunman-drives-car-into-capitol-hill-protesters/.

COMPLAINT (No. ) – 23

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone: 206.359.8000
Fax:  206.359.9000

148463513.5

the United States Constitution, and the chilling effect is stopping Plaintiffs from exercising the First Amendment rights which they had otherwise planned to exercise in the immediate future.

141.    The SPD's use of less-lethal force against protesters can reasonably be expected to chill a reasonable person from engaging in activity protected by the First Amendment.

142.    Indeed, the SPD's use of less-lethal force against protesters has had the purpose and the effect of suppressing large, continuous protests.

143.    The City's policy, practice, and custom of using less-lethal weapons to control and suppress demonstrations is not a reasonable regulation of the time, place, or manner of Plaintiffs' and the Plaintiff Class's First Amendment protected activity.

144.    Upon information and belief, the City's authorization of the use of less-lethal force against protesters was motivated by the viewpoint being expressed by the demonstrators.

145.    The City has acted with deliberate indifference to the First Amendment rights of Plaintiffs and the Plaintiff Class.

## VI.    SECOND CAUSE OF ACTION

### Violation of the Fourth Amendment

146.    The use of less-lethal weapons to control and suppress demonstrations in the absence of an immediate safety threat constitutes excessive force in violation of the Fourth Amendment, and the facts here show that the use of excessive force is stopping Plaintiffs from exercising their constitutional rights they otherwise planned to exercise.

147.    The City's policy, practice, and custom of allowing the SPD to deploy less-lethal weapons to control and suppress demonstrations in the absence of an immediate safety threat reflects deliberate indifference to protesters' rights under the Fourth Amendment to be free from excessive force.

## VII.    PRAYER FOR RELIEF

148.    WHEREFORE, Plaintiffs pray for the following relief:

COMPLAINT (No. ) – 24

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

148463513.5

A.  An order temporarily restraining the City and all agencies under its direction and from which it has requested assistance with regard to the protests from further violating the First and Fourth Amendment rights of Plaintiffs by using less-lethal weapons to control and suppress demonstrations;

B.  An order preliminarily enjoining the City and all agencies under its direction and from which it has requested assistance with regard to the protests from further violating the First and Fourth Amendment rights of Plaintiffs by using less-lethal weapons to control and suppress demonstrations;

C.  An order permanently enjoining the City and all agencies under its direction and from which it has requested assistance with regard to the protests from further violating the First and Fourth Amendment rights of Plaintiffs by using less-lethal weapons to control and suppress demonstrations;

D.  A declaration that the City has violated the First and Fourth Amendment rights of Plaintiffs by using less-lethal weapons to control and suppress demonstrations;

E.  For judgment against the City for Plaintiffs' costs of suit, including Plaintiffs' reasonable attorney fees;

F.  For such other relief as the Court may deem just and proper.

COMPLAINT (No. ) – 25

148463513.5

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1

2 DATED:  June 9, 2020

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

By:  s/ David A. Perez
David A. Perez, WSBA No. 43959
s/ Joseph M. McMillan
Joseph M. McMillan, WSBA No. 26527
s/ Mallory Gitt Webster
Mallory Gitt Webster, WSBA No. 50025
s/ Carolyn Gilbert
Carolyn Gilbert, WSBA No. 51285
s/ Nitika Arora
Nitika Arora, WSBA No. 54084
s/ Heath Hyatt
Heath Hyatt, WSBA No. 54141
s/ Paige L. Whidbee
Paige L. Whidbee, WSBA No. 55072

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Telephone:  206.359.8000
Fax:  206.359.9000
E-mail:  DPerez@perkinscoie.com
E-mail:  JMcMillan@perkinscoie.com
E-mail:  MWebster@perkinscoie.com
E-mail:  CGilbert@perkinscoie.com
E-mail:  NArora@perkinscoie.com
E-mail:  HHyatt@perkinscoie.com
E-mail:  PWhidbee@perkinscoie.com

By:  s/ Molly Tack-Hooper
Molly Tack-Hooper, WSBA No. 56356
s/ Nancy L. Talner
Nancy L. Talner, WSBA No. 11196
s/ Lisa Nowlin
Lisa Nowlin, WSBA No. 51512
s/ Breanne Schuster
Breanne Schuster, WSBA No. 49993
s/ John Midgley
John Midgley, WSBA No. 6511

**American Civil Liberties Union of
Washington Foundation**
P.O. Box 2728
Seattle, WA 98111
Telephone:  (206) 624-2184
E-mail:  mtackhooper@aclu-wa.org
E-mail:  talner@aclu-wa.org
E-mail:  lnowlin@aclu-wa.org
E-mail:  bschuster@aclu-wa.org

COMPLAINT (No. ) – 26

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

148463513.5

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

E-mail: jmidgley@aclu-wa.org


By: s/ Robert S. Chang
Robert S. Chang, WSBA No. 44083

**Fred T. Korematsu Center for Law and
Equality**
Ronald A. Peterson Law Clinic
Seattle University School of Law
1112 E. Columbia Street
Seattle, WA  98122
Telephone: 206.398.4025
Fax:  206.398.4077
E-mail:  changro@seattleu.edu

*Attorneys for Plaintiffs Black Lives Matter
Seattle-King County, Abie Ekenezar, Sharon
Sakamoto, Muraco Kyashna-tocha, Alexander
Woldeab, Nathalie Graham, and Alexandra
Chen*

COMPLAINT (No. ) – 27

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

148463513.5