1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

TAYLOR CHEAIRS,

               Plaintiff,

     v.

CITY OF SEATTLE et al.,

               Defendants.

CASE NO. 2:21-cv-01343-LK

ORDER GRANTING
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

       This action arises from injuries Plaintiff Taylor Cheairs suffered while attending a protest in Seattle late on the night of June 7, 2020. *See generally* Dkt. No. 1. He alleges that the City of Seattle, the Seattle Police Department, and several unnamed officers violated his First and Fourth Amendment rights under the United States Constitution when an SPD officer lobbed a blast ball grenade that ricocheted off the ground and exploded as it struck him in the groin. *Id.* at 2–7. Cheairs seeks monetary relief pursuant to 42 U.S.C. § 1983 as a result of the physical and psychological harm he experienced. *Id.* at 5–7. Currently before the Court is the City's Motion for Summary

Judgment. Dkt. No. 24.[1] Although Cheairs opposes the motion, he does not respond to the City's arguments that no seizure occurred under the Fourth Amendment, that his presence at the protest was not protected activity under the First Amendment because he was in violation of a valid order to disperse, and that there is no evidence of retaliatory animus. *See generally* Dkt. No. 41. For the reasons discussed herein, the Court grants the City's motion.[2]

## I.    BACKGROUND

**A.    Factual Background**

1. Protests Erupt Following the Killing of George Floyd

An intense, nationwide protest movement broke out in this country in the aftermath of George Floyd's killing in Minneapolis on May 25, 2020. *See, e.g.*, Dkt. No. 25-1 at 13; Dkt. No. 29-1 at 19; Dkt. No. 41-3 at 34. In Seattle, Mayor Jenny Durkan issued a proclamation of civil emergency on May 30, 2020 to address the "rapidly evolving" events and "escalating" police responses. Dkt. No. 25-1 at 22–25; *see also* Dkt. No. 27-1 at 27 (written statement of SPD Captain John Brooks noting that in Seattle, "[a]s the week progressed and greater attention nationally became focused on the death of George Floyd, the size of the event grew in scope and size"). The demonstrations in Seattle started to gain traction on May 29, 2020, and continued every day for the next week. *See* Dkt. No. 25-1 at 13 (SPD summary); *see also* Dkt. No. 25-1 at 2 (written statement of SPD Captain Matthew Allen noting that he worked in a demonstration management role on May 31, 2020, June 1–3, 2020, June 5, 2020, as well as June 7, 2020); Dkt. No. 27-1 at 27–74 (Captain Brooks' report on the events of May 30 through June 7); Dkt. No. 26-1 at 2 (use of force report authored by SPD Officer Carl Anderson noting that "[d]ue to the George Floyd

---

[1] The City filed a revised version of its motion correcting two minor clerical errors which the Court incorporates into its citations to Docket Number 24 herein. *See* Dkt. Nos. 34, 34-1.

[2] Because the Court can decide this motion based on the parties' filings, it denies the parties' requests for oral argument. Dkt. No. 24 at 1; Dkt. No. 41 at 1.

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 2

protests and riots, [he] ha[d] been working an emergency schedule with little time in between work shifts" and "had to use force multiple times in these incidents almost every day since 05/29/20."); *id.* at 3 ("The East Precinct area had been under siege by violent anti-police rioters for about six days at this point and we had already had at least three violent clashes.").

2.   Cheairs Attends the June 7, 2020 Protest in Capitol Hill

Cheairs is a Seattle resident in his mid-30s who attended one such demonstration around midnight on the night of June 7, 2020. Dkt. No. 41-5 at 1–2. He had just returned from out of town when he decided to go from his home in Columbia City for dinner in Capitol Hill. Dkt. No. 31-1 at 6–7. After dinner, Cheairs went to the area near the intersection of 11th Avenue and East Pine Street because he was curious about the budding protest movement. *Id.* at 7; *see also* Dkt. No. 41-5 at 1–2. He avers that he attended the protest to observe what was going on and that while there, he recorded two videos on his phone. Dkt. No. 41-5 at 2; Dkt. No. 31-1 at 8–9; *see also id.* at 9, 15–18 (Cheairs' deposition testimony describing his intent to film "the interaction between the protesters and the police" and affirming that he does not "remember anything from that night that isn't captured on those two videos," but also that he does not remember whether he started filming as soon as he arrived); Dkt. No. 31-1 at 33–34 (Cheairs' cell phone videos).

Cheairs' video recordings begin at approximately 12:08 a.m. on the morning June 8, 2020, and capture tense moments between protestors and SPD officers. Dkt. No. 31-1 at 33–34.[3] Audible at the beginning of Cheairs' first video is the following directive, broadcast by the SPD over a loudspeaker and punctuated by the sound of blasts and yelling:

> . . . all those assembled at 11th and Pine to immediately disperse, which means
> leave this area. If you do not do so, you may be arrested or subject to other police

---

[3] The City's expert, William T.C. Neale, prepared a synced compilation of four SPD officers' body worn videos ("BWVs") and Cheairs' two cell phone videos. Dkt. No. 28 at 2; Dkt. No. 28-1 at 36. The timestamps in the upper right corner of the BWVs read as "T07:08:40," but as the SPD's Forensic Digital Imaging Section manager explains, these timestamps are seven hours ahead of Pacific Standard Time. Dkt. No. 30 at 2; *see also* Dkt. No. 26-1 at 34.

action. Other police action could include the use of chemical agents or less lethal munitions, which may inflict significant pain or result in serious injury. If you remain in the area just described, regardless of your purpose, you will be in violation of city and state law. The following routes of dispersal are available: Westbound on Pine. Southbound on Twelve.

Dkt. No. 31-1 at 33 (00:01–00:41); *see also* Dkt. No. 29-1 at 23 (the full statement, issued while Cheairs was present, begins "I command all those assembled at 11th and Pine to immediately disperse . . . ."); Dkt. No. 26-1 at 25–26. Cheairs testified at deposition that he remembered there was a "loud speaker broadcast" but did not remember whether he heard the order of dispersal. Dkt. No. 31-1 at 10–11; *see also id.* at 14. However, in his declaration, he states that as he approached the intersection of 11th Avenue and Pine Street, the "SPD began to broadcast messages to try and move the crow[d]s[.]" Dkt. No. 41-5 at 2. He also remembers smelling a "kind of sulfuric fireworks smell" and seeing smoke. Dkt. No. 31-1 at 13–14. Despite what appeared to be a volatile situation, he stated that he did not consider leaving because he "wanted to see what was happening" and felt curious about the events. *Id.* at 18–19 ("[I]t didn't really cross my mind like, oh, I should leave. And there were a lot of people that were also there and not leaving . . . . So it didn't really occur to me like, oh, I should -- like, I have to get out of here."). The remainder of his first video documents a line of SPD officers standing across from the protestors gathered at the intersection of 11th and Pine, smoke in the air, unintelligible yelling, projectiles flying back and forth, and the sound of fireworks and other blasts. Dkt. No. 31-1 at 33 (00:42–02:29).

From the City's perspective, Cheairs' video captures the heated minutes several hours—and several days—into a volatile escalation spurred by violent individuals among the protestors. SPD personnel describe the protestors removing fencing earlier in the evening, closing in on the SPD positions throughout the night, fashioning improvised weapons, throwing dangerous objects at officers, and disobeying police orders. *See* Dkt. No. 25-1 at 3–10 (detailed report by Captain Allen regarding the night of June 7, 2020 and morning of June 8, 2020); *id.* at 12–20 (SPD Incident

Action Plan for June 7, 2020 describing the general environment); Dkt. No. 26-1 at 2–5, 20–26 (summary of the night's events as recounted by Officer Anderson); Dkt. No. 27-1 at 27–74 (Captain Brooks' recap of the days preceding and events of the night of June 7, 2020); *id.* at 83–100 (summary of SPD radio log of events); Dkt. No. 41-3 at 12 (additional radio log entries). Captain Allen, who served as the operations section chief on the night of June 7, 2020, described in detail the tension building over the course of the night. "[A]t approximately 1917 hours there was a group at 11th and Pine St. who breached the fence. I used the PA system to issue multiple warnings and asked them to organize themselves, but people disregarded the warnings and continued coming onto our side of the fence." Dkt. No. 25-1 at 5. "[A]t approximately 2000 hours there were about a hundred people on our side of the fence and the protest organizers were unable to convince them to return to the other side." *Id*.

At approximately 8:20 p.m., "a vehicle reportedly drove into the crowd and a man with a gun[] shot someone," and "[o]fficers quickly arrested the shooter and recovered the firearm[.]" *Id.* (citing SPD Case #20-183426); *see also* Dkt. No. 27-1 at 68. "[A]t approximately 2047 hours the driver of a red Ford Escape was reportedly handing out rocks to the small crowd at 12th Ave. and E. Pike St." Dkt. No. 25-1 at 6. "[A]t approximately 2103 hours there were about three hundred people in the crowd at 12th and Olive St. and some were shining flashlights into the officers' eyes. Per the SPOC log, at approximately 2120 hours protesters at 13th and Pine St. had taken down the heavy-duty fencing and were making announcements to burn down the precinct." *Id.* "[A]t approximately 2123 hours I used the PA to warn the crowd at 11th and Pine St. to stop disassembling the fence and stop advancing towards our officers. . . . Often[] times when I would ask the crowd to step back for their safety and ours, the crowd would repeatedly shout: YOU STEP BACK!" *Id.* "The protesters breached and disassemble[d] the fence. The protesters then disregarded multiple orders/requests to return to the other side of the fence. The protesters then

chose to continue advancing towards our police line. All the while, the officers continued to hold their initial line." *Id.* "[A]t approximately 2013 hours there were reportedly twenty protesters at 11th Ave. and Pike St. with shields, helmets and gas masks trying to start a disturbance." *Id.* at 7. "[A]t approximately 2228 hours the crowd at 12th and Pike St. brought up shields to the fence line." *Id.* "[A]t approximately 2345 hours there is a notation that the crowd (referring to the crowd in the 1100 block of Pine St.) was one foot away from officers. I would have estimated the distance at about three feet but in either event, it was far too close for comfort and left very little room to safely and effectively maneuver." *Id.*

"[A]t approximately 2345 hours there is a notation that the officers at 13th and Pine St. found an unlit Molotov cocktail on the ground and at the same time someone in the crowd reportedly threw a water bottle that contained an unknown chemical irritant so officers were donning their gas masks." *Id.* at 8. "I heard someone announce that some of the wooden shields some of the protesters had in their possession had nails in them and I directed the officers to confiscate them if possible." *Id.*

In light of the potential threats to safety presented by individuals among the crowd, Captain Brooks avers that "[a]s with other protests in the days prior to June 7, 2020, some trained officers on June 7, 2020 were equipped with less lethal tools, namely OC spray and blast balls." Dkt. No. 27 at 4.[4] He states that "[t]hese tools are designed to create space and stop assaultive behavior or property destruction" and "are intended to counter resistance without relying on greater force options that increase the likelihood of injury to the suspect, to the community or to the involved

---

[4] OC spray, or oleoresin capsicum spray, is commonly referred to as pepper spray. Dkt. No. 27-1 at 12, 72. A blast ball, sometimes referred to as a flash bang grenade, is "a light and sound diversion device" that can "help to disrupt ongoing criminal acts by causing a loud noise and flash of light." Dkt. No. 27 at 4; *see* Dkt. No. 29-1 at 29–30 (detailed description of blast ball); Dkt. No. 27-1 at 76 (image of blast ball); *id.* at 81 (manufacturer specifications on blast ball).

officers." Dkt. No. 27 at 4 ("The tools also allow officers to address and counteract assaultive conduct from a distance, which protects other protestors, police, property, and the suspect.").

By the time Cheairs started filming, the SPD had begun deploying these less lethal tools. *See, e.g.*, Dkt. No. 25-1 at 8 (Captain Allen: "[A]t approximately 0004 hours in the 1100 block of E. Pine St., there was reportedly a disturbance on the north side of the line followed by a deployment of OC spray and OC blast balls."). According to Captain Allen's summary, "at approximately 0005 hours there is a notation that the camera shows protesters throwing items at officers and a minute later, fireworks and bottles were reportedly being thrown by the crowd." *Id.*

Earlier in the night, Captain Allen instructed the officers on the line to activate their body worn cameras. *Id.* at 5.[5] The BWVs reflect a significant escalation beginning at approximately 12:04 a.m., the precise cause of which is difficult to discern. *See* Dkt. No. 30-1 at 2 (00:17:13–02:02:09) (Officer Washington's BWV showing protestors standing feet away from police and chanting for nearly two hours until a sudden disturbance in the crowd leads to the deployment of OC spray and the protestors moving back, followed by dozens of projectiles being lobbed toward police and the increased police use of less lethal munitions); *id.* at 1 (00:00:15–00:18:15) (Officer Anderson's BWV showing the same transition from standoff to sudden escalation); *id.* at 3 (00:01:00–00:35:38) (Officer Oh's BWV showing the same); *id.* at 4 (00:01:23–00:35:25) (Officer Knight's BWV showing the same); *see also* Dkt. No. 25-1 at 8 (Captain Allen's written report); Dkt. No. 27-1 at 69 (Captain Brooks' written statement that "the group at 11th and Pine began throwing objects at the line. I observed officers respond with OC spray directed at the perpetrators.").[6]

---

[5] The four SPD officers whose BWV is submitted in the record are as follows: Officer Anderson, Officer Quindelia Washington, Officer Curtis Oh, and Officer Joshua Knight. *See* Dkt. No. 24 at 7; Dkt. No. 30 at 2.

[6] The Court notes that Officer Oh appears to be struck with a water bottle right at the same time, but it is not clear

1    At around 12:10 a.m., after several minutes of the SPD's ongoing deployment of less lethal

2    munitions and the protestors refusing to disperse and continuing to throw projectiles, the police

3    line moved toward the protestors gathered across 11th Avenue. *See* Dkt. No. 30-1 at 1 (00:23:31–

4    00:24:05) (Officer Anderson's BWV); *id.* at 2 (02:07:55–02:08:11) (Officer Washington's BWV);

5    *id.* at 3 (00:40:48–00:41:20) (Officer Oh's BWV); *id.* at 4 (00:40:25–00:40:50) (Officer Knight's

6    BWV); Dkt. No. 27-1 at 69 (Captain Brooks: "I felt it was tactically unsound to remain in place

7    and I ordered the line officers to advance from approximately midblock on Pine, west to 11th.").

8    From SPD's perspective, "at approximately 0011 hours, our personnel were reportedly being

9    surrounded on three sides (of the intersection [of 11th and Pine]): south, west, and north." Dkt.

10   No. 25-1 at 8. "I then heard someone on the radio announce that there was a man with a gun at

11   11th and Pine St. and I was gravely concerned that someone was going to get shot and killed. There

12   had already been one person shot earlier in the evening and I did not want there to be another." *Id.*

13   Because "[f]urther de-escalation efforts were neither safe nor feasible," and "[t]o protect the lives

14   of everyone present, I directed the SWAT Commander, Lieutenant Bergmann (Unit 271), to

15   deploy CS gas with the expectation that it would help quell the violence and further disperse the

16   crowd." *Id.* Then, shortly after 12:14 a.m., SPD officers deployed tear gas and the crowd began to

17   disperse. *See* Dkt. No. 30-1 at 1 (00:27:45–00:28:25) (Officer Anderson BWV); *id.* at 2 (02:11:53–

18   02:12:43) (Officer Washington BWV); *id.* at 3 (00:44:55–00:45:45) (Officer Oh BWV); *id.* at 4

19   (00:44:40–00:45:25) (Officer Knight's BWV); Dkt. No. 27-1 at 69 (Captain Brooks: "I requested

20   the use of CS and it was granted. I felt this was the only thing that would stop the attacks and

21   provide enough room for officers to move to address the crowd. CS was deployed and it very

22   quickly disrupted the attacks and permitted us to move.").

23

24   _____

whether that is what specifically caused the escalation. *See* Dkt. No. 30-1 at 3 (00:34:55–00:35:20) (Officer Oh's BWV).

The transcript of the SPD radio log from the night of June 7 and morning of June 8 further reflects the escalating confrontation:

- **10:21:02 p.m.** – Captain Brooks authorizes use of blast balls if officers confronted.

- **10:53:14 p.m. & 11:17:39 p.m.** – Captain Allen says that multiple warnings had been given to the crowd to move back to no avail.

- **12:04:02 a.m.** – Captain Allen calls for officers to "fall back."

- **12:04:19 a.m.** – Captain Allen: "Hold the air, hold the air. We have a disturbance, north side of our line, 11th and Pine."

- **12:04:55 a.m.** – Captain Brooks: "Deploy OC Blast Balls. Hold the line."

- **12:05:39 a.m.** – Captain Allen says that a dispersal order has been given.

- **12:05:56 a.m.** – Captain Brooks: "We're still taking multiple bottles and fireworks (unintelligible)."

- **12:07:09 a.m.** – Captain Allen: "[W]e have items being thrown at the officers. We are deploying munitions. I've given two dispersal orders. Um, we have a green laser coming back at us, shining at the officers' eyes."

- **12:09:19 a.m.** – Captain Brooks makes a broadcast that is mostly unintelligible but mentions projectiles, followed by orders to "keep using blast balls."

Dkt. No. 41-3 at 12–13; *see also* Dkt. No. 27-1 at 87–93.

3. Cheairs Is Injured By a Blast Ball

At approximately 12:12 a.m. on June 8, 2020, Officer Anderson—whom the City has identified as the officer who deployed the munition that struck Cheairs—lobbed a blast ball which bounced on the pavement in front of Cheairs and then struck him in the groin while he was standing on the sidewalk on the corner of 11th and Pine. Dkt. No. 24 at 9; Dkt. No. 30-1 at 1 (00:25:13–00:25:49) (Officer Anderson BWV); Dkt. No. 31-1 at 34 (00:00:46–00:00:55) (Cheairs' cell phone video); Dkt. No. 28-1 at 36 (00:03:17–00:03:33) (synchronized video prepared by Neale).

Cheairs testified at deposition about his memory of the incident:

So I'm standing there filming, kind of panning around to catch the scene of what's going on, and I come back quite a bit from sort of the front corner of the

intersection. I'm standing back probably, I don't know, about ten yards, and this ball of sparks just like super fast flies across the ground, you know. I see it. It's filming. And it hits the curb and it bounces up, and it hits me, like, directly in the groin. It all happens very quickly, but the second it hits, it also explodes. So it was like a one-two.

And I immediately, like, turned around and there was like a guy who said, "Are you okay?" And I was just like, "I have to leave." You know, like everything got really real really fast. And I'm -- I was freaking out.

Dkt. No. 31-1 at 22. Cheairs said the pain felt like "getting punched with barb wire, because it's like this combination of, like, getting hit really, really hard by something, but then, also, this crazy, like, stinging burning." *Id.* at 23; *see also* Dkt. No. 41-2 at 13 ("[I]t hurt really bad. Like, immediately it felt like I had been punched extremely hard in the abdomen. And then it started to feel like my groin area, lower abdomen was on fire.").

After Cheairs retreated to safety, he undid his pants and reached his right hand down to his groin and it "felt welt," and when he pulled his hand up, it was "covered in blood." Dkt. No. 31-1 at 22–23. Within the 15 or 20 minutes, Cheairs arrived at Swedish Medical Center on Capitol Hill to seek treatment for his injuries. *Id.* at 24–25; Dkt. No. 41-5 at 2–3. The injuries included a "half-dollar or larger size area of skin that had been either burned or exploded off to the right of [his] penis and then the front or top of [his] penis had cuts and lacerations down the front," as well as a three inch "gash" on his "left upper thigh." Dkt. No. 31-1 at 25; Dkt. No. 41-2 at 2–4 (photos of the injury). Other than two "slight" scars, Cheairs testified at deposition that his physical injuries completely healed in about six weeks. Dkt. No. 31-1 at 26. And although he has never been diagnosed, he claims to "suffer symptoms of Post-Traumatic Stress Disorder (PTSD)" because he "often avoid[s] crowds and experience[s] panic when seeing police officers and vehicles," and further avers that he has "received counseling for [his] emotional distress resulting from this incident." Dkt. No. 41-5 at 3; *see* Dkt. No. 45-1 at 13 (Cheairs' deposition testimony affirming that he has never received a PTSD diagnosis).

1        4.  <u>Officer Anderson Explains His Use of Force</u>

2        Officer Anderson has been a member of the SPD since 2001 and SPD's SWAT team since

3   2007, and prior to June 7, 2020, had received extensive training on use of force, use of less lethal

4   munitions—including blast balls—and crowd control. Dkt. No. 26 at 1–2; Dkt. No. 26-1 at 14–15;

5   *see also* Dkt. No. 41-3 at 9 (noting that Officer Anderson's SPD training records indicate that he

6   "was up to date with his training and had attended blast ball training as recently as 04/29/2020").

7        In the moments surrounding Cheairs' injury, Officer Anderson deployed a series of four

8   blast balls in quick succession, the second of which appears to have hit Cheairs. *See* Dkt. No. 30-

9   1 at 1 (00:25:13–00:25:49) (Officer Anderson's BWV); *id.* at 3 (00:42:38–00:43:20) (Officer Oh's

10  BWV); Dkt. No. 28-1 at 36 (00:03:07–00:03:42) (synchronized video).[7] The Office of Police

11  Accountability ("OPA") subsequently investigated Officer Anderson for the fourth blast ball in

12  the series, which struck a woman and purportedly led to her entering cardiac arrest. Dkt. No. 26-1

13  at 51–56; *see* Dkt. No. 30-1 at 2 (02:10:05–02:10:20) (Officer Washington's BWV of the incident);

14  *id.* at 3 (00:42:50–00:43:20) (Officer Oh's BWV of the incident).[8]

15       SPD Sergeant Juan Tovar interviewed Officer Anderson on October 8, 2020 as part of

16  OPA's investigation. Dkt. No. 26-1 at 12. With respect to his intended target when throwing the

17  four blast balls, Officer Anderson stated that he was attempting "[t]o disperse the crowd, to provide

18  space and time and distance between the line officers and the assaultive crowd." *Id.* at 31–32

19  _____

20  [7] In its motion, the City indicates that the "third of the series struck" Cheairs, Dkt. No. 24 at 11, but that appears inconsistent with the video evidence it submitted in the record.

21  [8] OPA sustained an allegation of improper deployment of the fourth blast ball against Officer Anderson, and he appealed that decision. Dkt. No. 26-1 at 51, 55–56; Dkt. No. 26 at 3. Cheairs' also filed a complaint with OPA but

22  OPA declined to pursue a further investigation because the SPD conduct alleged by Cheairs had already been assessed in OPA's prior investigation. *See* Dkt. No. 26-1 at 55 (Officer Anderson "deployed four blast balls in quick

23  succession . . . . With regard to the first three deployments, [Officer Anderson] appeared to throw the blast balls into open space. . . . OPA finds that it was within policy to use blast balls to continue to push the crowd back, thus creating a buffer between officers and demonstrators and protecting officers from being struck by projectiles."); Dkt. No. 41-

24  3 at 21 (email from OPA to Cheairs' counsel stating that "[a]s Mr. Cheairs did not provide any new information that OPA can act upon, we consider this matter closed and will take no further action").

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 11

("[T]rying to keep the line officers safe, to push the crowd back so they couldn't target us with thrown or launched projectiles, I am attempting to push the crowd back as ordered by the Incident Commander."). In response to Sergeant Tovar's question about why said deployment was reasonable, Officer Anderson said:

> We were being ah, feloniously assaulted by a hostile crowd. I was given the order to disperse the crowd. They were given a lawful dispersal order to leave the immediate area, and they failed to do that. Um, I was creating time and distance and shielding between the line officers and the—the rioters. That is why I believe it was reasonable and appropriate.

*Id.* at 34. When asked specifically about the target of his deployment of the blast ball that struck Cheairs, Officer Anderson similarly stated that he was "continuing to try to push and disperse the crowd that ha[d] been given several dispersal orders, who ha[d] refused to leave the area, refused lawful order to disperse, and . . . continue[d] to assault [officers] with possible deadly force." *Id.* at 35–36 (stating that he was attempting "to create time distance, and shielding between the line officers and the . . . assaultive crowd"); *see also id.* at 37–42 (providing substantively the same answers with respect to third and fourth blast balls deployed).

As for his decision to throw these blast balls overhand instead of rolling them, Officer Anderson stated that "there was a line of officers in front of [him], so [he] was unable to roll it on the ground in between them because of . . . obstructions," and also because he was trying to deploy the blast balls "further out." *Id.* at 47; *see also id.* at 33 (noting that due to his height, Officer Anderson could not necessarily see over the line of officers standing in front of him). In addition, Officer Anderson indicated that his deployment of the blast balls was *not* proportional to the threat posed by the protestors because it was *less* forceful that what was warranted in light of the protestors' actions toward police. *Id.* at 35, 38–39.

Officer Anderson prepared his written recollection of the events of that night ten days later, on June 17, 2020, and included notes regarding several uses of force in the span of a few minutes:

I observed Officers deploying OC spray and blast balls with little effect. I deployed four to five OC muzzle blast rounds from my 40mm multi-launcher towards the front line of the rioters. I then started deploying inert and OC blast balls in between the line Officers and the protesters to move the crowd back from the line and to keep the Officers from being assaulted. We were then given the command to start pushing the crowd westbound on Pine St. I clearly heard Cpt. Allen giving dispersal orders over the PA system several times. When we were near the intersection of 11th and Pine, I heard the incident commander give the order to deploy CS to disperse the rioters.

I used force multiple times throughout this event. I deployed numerous inert and OC blast ball grenades, 40mm direct impact rounds, 40mm OC muzzle blast rounds, and CS grenades to protect myself and the line Officers from being feloniously assaulted, to create time and distance between the line Officers and the rioters, and to disperse the crowd.

I used the blast balls and CS grenades to move the assaultive crowd back from the Officers and to stop felony assaults. I deployed the blast balls in both the underhand and overhand method. I was forced to use overhand deployments due to being behind a line of Officers at times and to get them deployed farther out.

*Id.* at 4; *see also id.* at 43; Dkt. No. 41-3 at 6–7 (Force Investigation Report prepared by Detective Jason Dewey); Dkt. No. 30-1 at 1 (00:17:55–00:29:31) (Officer Anderson's BWV); Dkt. No. 26 at 3 (Officer Anderson's declaration). As for his justification for using force, Officer Anderson stated that "[o]n each occasion that [he] used force, [he] made [his] decisions based on specific circumstances that warranted the level of force used to stop the occurrence of crimes" and that he "felt that the resistance and assaultive behavior presented by the rioters were likely to cause injuries to Officers and that hands-on control tactics and other force options would be likely to cause greater injury to the rioters than [his] use of blast balls, CS grenades and direct impact munitions." Dkt. No. 26-1 at 4; *see also id.* at 5 ("I was forced to make split-second decisions during extremely tense, uncertain, dynamic and rapidly evolving circumstances. I attempted to only use force that was proportional to the threats and urgency of the situation to disperse the rioters and to keep myself and other Officers safe.").

1          5.   SPD's Policy on Blast Balls and Court Action Subsequent to Cheairs' Injury

2       SPD policy requires the use of force to be objectively reasonable, necessary, and

3 proportional to a subject's threat of resistance. Dkt. No. 27-1 at 134–35. In general, "[t]he

4 deployment of blast balls within close proximity to people is reported and investigated as Type II

5 force," regardless of whether someone is injured or complains. *Id.* at 141. Type II force is defined

6 as "[f]orce that causes or is reasonably expected to cause physical injury greater than transitory

7 pain but less than great or substantial bodily harm." *Id.* at 137. Blast balls are only allowed to be

8 deployed by officers who have completed required training, and "[w]hen feasible, officers shall

9 avoid deploying blast balls in the proximity of people who are not posing a risk to public safety or

10 property," and not until after a dispersal order has been issued, the crowd has been given a

11 reasonable amount of time to comply, and a supervisor has authorized the deployment. *Id.* at 140;

12 *see also* Dkt. No. 27 at 5–6 (describing the required training). However, officers "may reasonably

13 deploy blast balls to address an imminent risk of harm to a person or significant property damage."

14 Dkt. No. 27-1 at 140. "The preferred method of blast ball deployment is low deployment ('bowling

15 style')," but officers are permitted to "use a high deployment ('overhand throw') when the need

16 for a farther deployment or the need to get around an obstruction outweighs the risk created by the

17 separating sub-munition." *Id.*; *see also* Dkt. No. 27 at 5–6. Officers are required to report their use

18 of blast balls regardless of whether an individual is struck, and "must document their deployment

19 method and the reasoning for using such in their use-of-force report." Dkt. No. 27-1 at 140–41;

20 Dkt. No. 27 at 6 ("The Seattle Police Department highly scrutinizes 'high' deployment of

21 munitions."). In addition, "[a]fter the initial blast ball deployment, each subsequent deployment

22 must be reasonable and the employee should reevaluate the situation accordingly." Dkt. No. 27-1

23 at 141.

24

1   The City points out that this district reviewed and approved its use of force and crowd

2   management policies as part of its consent decree with the Department of Justice. *See* Dkt. No. 44

3   at 5; Dkt. No. 45-1 at 22–102. Cheairs submits a 2022 preliminary assessment of the SPD's use of

4   force prepared by the Seattle Police Monitor, which notes that "[o]ver the course of the Consent

5   Decree, SPD's use of force decreased significantly" with the exception of "the historic levels of

6   protest-related force in 2020. SPD reported record high usage of less lethal instruments both during

7   protest situations and outside of protests in 2020." Dkt. No. 41-3 at 25. The assessment observes

8   that "the Department sometimes used force against the protest crowds generally, when only certain

9   individuals amidst the crowd may have been committing criminal acts," and that the "SPD used

10  tools like blast balls, tear gas, and OC spray against crowds sometimes in an indiscriminate manner

11  with insufficient justification in reporting for such actions." *Id.* at 36. Further, Cheairs notes that

12  on June 9, 2020, a group of plaintiffs moved for a temporary restraining order against the SPD

13  related to its use of less lethal munitions, and on June 12, 2020, the Honorable Richard A. Jones

14  granted the motion. Dkt. No. 41-2 at 27–38; Dkt. No. 41-3 at 52–85. On June 17, 2020, Judge

15  Jones entered a stipulated order for a preliminary injunction. Dkt. No. 41-4 at 2–4. The order

16  enjoined the SPD from "employing chemical irritants or projectiles of any kind," including blast

17  balls, "against persons peacefully engaging in protests or demonstrations," but expressly reserved

18  the right of individual officers to take "necessary, reasonable, proportional, and targeted action to

19  protect against a specific imminent threat of physical harm to themselves[.]" *Id.* at 3. On December

20  7, 2020, Judge Jones held the City in contempt for violations of the preliminary injunction,

21  including with respect to three instances where SPD officers threw blast balls. Dkt. No. 41-2 at

22  40–66. Cheairs further highlights that Mayor Durkan expressed disapproval over the SPD's tactics

23  during her remarks on June 7, 2020, saying: "SPD's response needed to be better measured. While

24  the accountability system will review all of the facts, the response seem[ed] too quick to escalate.

Too quick to deploy of flash bangs, pepper spray and deployment of the National Guard." Dkt. No. 41-4 at 57.

**B.    Procedural Background**

Cheairs initiated this action in October 2021. Dkt. No. 1. He seeks damages under Section 1983 for the injuries he suffered as a result of blast ball incident. *Id.* at 5–7. Following the completion of discovery, the City moved for an order granting summary judgment on all of Cheairs' claims. Dkt. No. 24 at 2. The parties met and conferred prior to the City's filing the instant motion. *Id.*; Dkt. No. 31 at 2.

## II.    DISCUSSION

**A.    Jurisdiction**

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Cheairs alleges constitutional violations under 42 U.S.C. § 1983. *See* Dkt. No. 1 at 2.

**B.    Legal Standard**

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court does not make credibility determinations or weigh the evidence at this stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The sole inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. And to the extent that the Court resolves factual issues in favor of the nonmoving party, this is true "only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

The Court will, however, enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on

1   which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

2   (1986). Once the moving party has carried its burden under Rule 56, "the nonmoving party must

3   come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec.*

4   *Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (cleaned up). Metaphysical doubt

5   is insufficient, *id.* at 586, as are conclusory, non-specific allegations, *Lujan*, 497 U.S. at 888–89.

6   **C.   Preliminary Matters**

7       1.   Cheairs Cannot Substitute Individual Officers in His Opposition to the City's Motion

8           The City argues that because Cheairs does not name an individual defendant in his

9   operative pleading, he must meet the relevant standards for establishing municipal liability under

10  *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). *See* Dkt.

11  No. 24 at 15–16 ("[Cheairs] does not bring any claims against Officer Anderson or any other

12  individual defendant."); *see also* Dkt. No. 44 at 6–7. In a footnote in his opposition to the City's

13  motion, Cheairs does not dispute that he has failed to seek amendment of the complaint to

14  substitute any individual officer for a named Doe Defendant, even after learning of Officer

15  Anderson's identity in May 2022. Dkt. No. 41 at 16 n.3. Nevertheless, he "urges the Court to allow

16  a simple amendment to substitute Officer Anderson's name for John Doe." *Id.*

17         Requests for affirmative relief must be made in a motion and not a responsive brief. *See*

18  Fed. R. Civ. P. 7(b); LCR 7(b); *Meghinasso v. Mercedes-Benz USA*, No. C17-5930-LK, 2022 WL

19  226078, at *1 (W.D. Wash. Jan. 26, 2022). More fundamentally, Cheairs provides no legal

20  authority in support of his request, nor does he explain why he did not seek such amendment by

21  the deadline for amended pleadings or at any time prior to responding to the City's motion for

22  summary judgment. *See Kuhlmann v. Christianson*, No. 1:14-CV-01042-BAM, 2015 WL

23  5008976, at *2 (E.D. Cal. Aug. 20, 2015) (finding that "there is no indication that Plaintiff was

24  diligent in seeking an amendment to substitute individuals for the doe defendants" where he "made

no effort to add these defendants prior to the . . . deadline to amend" and did not "make any effort to extend the deadline to amend during the course of litigation"). Accordingly, the Court denies his request and dismisses Cheairs' claims against the Doe Defendants. *See Brass v. Cnty. of Los Angeles*, 328 F.3d 1192, 1197–98 (9th Cir. 2003) (affirming district court's refusal to permit plaintiff to substitute individual law enforcement officers for Doe defendants where plaintiff did "not even attempt[] to request leave from the Court to add new parties or to file an amended complaint"); *see also Drewry v. Cnty. of Riverside*, No. EDCV-20-2554-JGB(SHKx), 2023 WL 2627740, at *6 (C.D. Cal. Jan. 23, 2023) (dismissing all claims against Doe defendants where, "[d]espite ample opportunity," Plaintiff failed to move "to amend the complaint to name any doe defendant," and the deadline to add parties to the complaint had passed).

### 2. The City's Motion to Strike is Denied

The City asks the Court to strike two portions of Cheairs' declaration because they contradict his deposition testimony. Dkt. No. 44 at 1 (citing LCR 7(g)). Specifically, the City requests that the Court strike the sentence in Cheairs' declaration stating that as he approached the intersection of 11th Avenue and Pine Street, the crowd was "largely peaceful and in the main was not directly engaging with SPD," as well as the sentence stating that Cheairs "suffer[s] from symptoms of Post-Traumatic Stress Disorder[.]" *Id.* at 1–2 (citing Dkt. No. 41-5 at 2–3). The City contrasts these statements with Cheairs' deposition testimony that he could not recall if the crowd threw objects at the police and that he has never been diagnosed with PTSD. *Id.* at 2–3 (citing Dkt. No. 45-1 at 9–11, 13).

In general, "a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991). But this rule "does not automatically dispose of every case in which a contradictory affidavit is introduced," and instead pertains to "sham" testimony "that flatly contradicts earlier testimony in an attempt to

create an issue of fact and avoid summary judgment." *Id.* at 266–67 (quotation marks omitted). District courts must make "a factual determination that the contradiction was actually a 'sham'" before granting such motion. *Id.* at 267; *see also Legal Aid Servs. of Or. v. Legal Servs. Corp.*, 561 F. Supp. 2d 1187, 1203 (D. Or. 2008), *aff'd*, 608 F.3d 1084 (9th Cir. 2010). In addition, the Ninth Circuit has "emphasized that the inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit," and that "the non-moving party is not precluded from elaborating upon, explaining or clarifying prior testimony[.]" *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998–99 (9th Cir. 2009) (quoting *Messick v. Horizon Indus.*, 62 F.3d 1227, 1231 (9th Cir. 1995)).

The Court cannot conclude based on the record before it that the disputed portions of Cheairs' declaration constitute "sham" testimony in this context. First, Cheairs' attestation that he is traumatized and suffers from "symptoms" of PTSD does not necessarily contradict his deposition testimony that he has never been diagnosed with PTSD. *Compare* Dkt. No. 45-1 at 10–11, 13, *with* Dkt. No. 41-5 at 3. *See, e.g.*, *Legal Aid Servs. of Or.*, 561 F. Supp. 2d at 1203 (denying motion to strike where both the deposition testimony and later-filed declaration "could simultaneously be true."). Cheairs testified at his deposition that he reported "feelings or symptoms of trauma" to his doctor. Dkt. No. 45-1 at 11. Nor is this factual dispute particularly relevant to the motion at hand given that the City does not dispute that Cheairs suffered physical injuries as a result of being struck by the blast ball.

Second, that Cheairs did not know whether members of the crowd were throwing objects at the police does not clearly and unambiguously contradict his declaration. In his declaration, Cheairs states:

> As I approached the intersection of 11th Avenue and Pine Street in Capitol Hill, I noticed a large crowd of people adjacent to a phalanx of SPD officers dressed in

fully militarized riot gear. The crowd at this intersection was largely peaceful and in the main was not directly engaging with SPD.

Dkt. No. 41-5 at 2. The City argues that this is "merely an attempt to rewrite his deposition testimony to create an issue of fact about the crowd's conduct," Dkt. No. 44 at 2, but it can simultaneously be true that Cheairs did not know as he approached the intersection that protestors were assaulting and throwing objects at officers and that his impression at the time was that the crowd appeared "largely" peaceful and "in the main" not directly engaging with the SPD. Moreover, Cheairs testified at deposition that he did not remember whether he started filming as soon as he arrived at the demonstration, Dkt. No. 31-1 at 9, and that his memory of the event is perhaps impacted by how many times he has watched his own video recordings, *id.* at 14 ("It's actually one of the things where I'm not sure if, you know, the memory that I have is directly connected to that event or if it's because I have the entire thing on video."). In fact, Cheairs said at his deposition that he did not remember anything from that night that was not captured on his two videos. *Id.* at 15.

Certainly, a reasonable factfinder could consider Cheairs' deposition testimony to undermine the trustworthiness of the assertions in his declaration regarding crowd behavior. But this is a question of credibility: contradictions in the testimony that fall short of the "clear and unambiguous" standard "affect the weight given to the evidence, rather than its admissibility," and are not "grounds for automatically striking the testimony[.]" *Williams v. Los Angeles Sheriff's Dep't*, No. CV 17-05640-AB (Ex), 2020 WL 5948286, at *7 (C.D. Cal. June 29, 2020) (cleaned up). Finally, the Court notes that "for purposes of ruling on a motion for summary judgment, [it] may properly view the facts in the light depicted by bodycam footage and its accompanying audio, to the extent the footage and audio *blatantly* contradict testimonial evidence." *Hughes v. Rodriguez*, 31 F.4th 1211, 1218 (9th Cir. 2022).

Accordingly, the City's motion to strike is denied. *See, e.g.*, *Hunters Cap., LLC v. City of Seattle*, No. C20-0983-TSZ, 2023 WL 184209, at *10 n.14 (W.D. Wash. Jan. 13, 2023); *New Flyer Indus. Canada ULC v. Rugby Aviation, LLC*, 405 F. Supp. 3d 886, 901 n.6 (W.D. Wash. 2019).

**D.    The City's Motion for Summary Judgment**

The City argues that Cheairs (1) fails to "state a claim" for municipal liability under 42 U.S.C. § 1983; (2) has not raised a genuine dispute as to whether Defendants violated his First and Fourth Amendment rights; and (3) cannot adequately establish municipal liability sufficient to survive summary judgment on his *Monell* claim. Dkt. No. 24 at 17–25; Dkt. No. 44 at 7–15. Cheairs maintains that his constitutional rights were violated, and that his *Monell* claim should be decided by a jury. Dkt. No. 41 at 16–27. The Court finds that summary judgment is warranted because Cheairs has not established a genuine issue for trial with respect to necessary elements of his First and Fourth Amendment claims, thus precluding liability on his *Monell* claim.

1.    <u>No Disputes of Material Fact Exist Regarding Whether a Constitutional Violation Occurred</u>

"Section 1983 provides a cause of action for 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508 (1990) (quoting 42 U.S.C. § 1983). In *Monell*, the Supreme Court held that municipalities may only be held liable under Section 1983 for constitutional violations resulting from official policy or custom. 436 U.S. at 694; *see also id.* at 691 ("[A] municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."). However, the "first inquiry" in any suit pursuant to Section 1983 "is whether the plaintiff has been deprived of a right 'secured by the Constitution and laws.'" *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1145 (9th Cir. 2021) (quoting *Baker v. McCollan*, 443 U.S. 137, 140 (1979)); *see also Orin v. Barclay*, 272 F.3d

1207, 1217 (9th Cir. 2001) ("A § 1983 action against a city fails as a matter of law unless a city employee's conduct violates one of the plaintiff's federal rights."); *Quintanilla v. City of Downey*, 84 F.3d 353, 355 (9th Cir. 1996) ("[A]n individual may recover under § 1983 only when his federal rights have been violated."). Thus, the Court addresses Cheairs' claims of constitutional violations under the Fourth and First Amendments.

### (a) Cheairs Has Not Raised a Genuine Dispute of Material Fact Precluding Summary Judgment on His Fourth Amendment Claim

"In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394 (1989). "The validity of the claim must then be judged by reference to the specific constitutional standard which governs that right, rather than to some generalized 'excessive force' standard." *Id.*; *accord Hughes*, 31 F.4th at 1220.

Cheairs alleges his excessive force claim under the Fourth Amendment, Dkt. No. 1 at 2, 6–7, which protects against unreasonable seizures, *see Seidner v. de Vries*, 39 F.4th 591, 596 (9th Cir. 2022). There are two ways a person may be seized for purposes of the Fourth Amendment: by physical force or show of authority. *Terry v. Ohio*, 392 U.S. 1, 19, n.16 (1968); *see also Torres v. Madrid*, 592 U.S. 306, 322 (2021). Here, it is undisputed that Cheairs did not voluntarily submit to officers' repeated commands for the crowd to disperse. Thus, even assuming that an order to disperse can constitute seizure by show of authority if the subject yields, there is no dispute that this species of seizure did not occur here. *See California v. Hodari D.*, 499 U.S. 621, 626 (1991) (a seizure by show of authority does not occur if the subject does not yield). The threshold question is therefore whether Cheairs was seized by physical force when he was hit with a blast ball deployed by Officer Anderson. *Seidner*, 39 F.4th at 596 (citing *Villanueva v. California*, 986 F.3d 1158, 1165 (9th Cir. 2021)).

1    The City argues that the blast ball striking Cheairs does not constitute a seizure as a matter

2    of law because (1) Officer Anderson did not intend to hit or apprehend Cheairs, but instead

3    "wanted to create space and cause people in the crowd to leave the area as they had been ordered

4    to"; and (2) "it is undisputed that [Cheairs'] freedom of movement was not restricted by that use

5    of force." Dkt. No. 24 at 18–19; *see also* Dkt. No. 44 at 7–8. Specifically, "Anderson did not intend

6    to apprehend [Cheairs] or anyone else," and "the video showing the blast ball impacting the

7    ground, bounding, and changing direction forecloses any argument that Anderson was trying to

8    hit [Cheairs] with the blast ball"; therefore, "[a]t most, this was 'accidental' force[.]" Dkt. No. 24

9    at 18–19.

10    Not "every physical contact between a government employee and a member of the public"

11    qualifies as a Fourth Amendment seizure. *Torres*, 592 U.S. at 317. As the Supreme Court has

12    emphasized, "[a] seizure requires the use of force *with intent to restrain*," and "[a]ccidental force

13    will not qualify." *Id.* "Nor will force intentionally applied for some other purpose satisfy this rule."

14    *Id.* This inquiry is an objective one: the question is whether the challenged conduct objectively

15    manifests an intent to restrain, without regard to the subjective motivations of police officers or

16    the seized person. *Id.*

17    As the City points out, Cheairs does not respond to or otherwise rebut the City's arguments

18    that no seizure occurred for purposes of the Fourth Amendment, and instead addresses only

19    whether Officer Anderson's use of force was reasonable. Dkt. No. 44 at 7; *see generally* Dkt. No.

20    41. It is the nonmoving party's job "to identify with reasonable particularity the evidence that

21    precludes summary judgment," and if he elects not to do so, the Court need not "scour the record

22    in search of a genuine issue of triable fact[.]" *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996)

23    (quoting *Richards v. Combined Ins. Co.,* 55 F.3d 247, 251 (7th Cir. 1995)); *see also Celotex*, 477

24    U.S. at 322. In fact, the Court *cannot* do so: "[u]nder the principle of party presentation, courts

must presume that parties represented by competent counsel know what is best for them, and are responsible for advancing the facts and argument entitling them to relief." *Todd R. v. Premera Blue Cross Blue Shield of Alaska*, 825 F. App'x 440, 442 (9th Cir. 2020) (quotation marks and citation omitted). This principle is especially forceful "in a case such as this, involving a specialized area of civil law and competent, highly experienced counsel on both sides." *Id.* Because Cheairs chose not to respond to the City's arguments relating to seizure, the City's factual averments with respect to whether a seizure occurred, *see* Dkt. No. 24 at 17–19, are undisputed, and Cheairs has waived argument on the issue. *See* Fed. R. Civ. P. 56(e)(2); *Samica Enterprises LLC v. Mail Boxes Etc., Inc.*, 460 F. App'x 664, 666 (9th Cir. 2011) ("Arguments not raised in opposition to summary judgment . . . are waived."); *Loomis v. Cornish*, 836 F.3d 991, 997 (9th Cir. 2016) ("[Plaintiff] did not raise these arguments before the district court in his opposition to summary judgment, so they were waived."); *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 405 (6th Cir. 1992) ("[The nonmoving party's] burden to respond is really an opportunity to assist the court in understanding the facts. But if the non-moving party fails to discharge that burden—for example, by remaining silent—its opportunity is waived and its case wagered.").

The undisputed facts are as follows. As violence directed at the police from protestors escalated,[9] the SPD "broadcast messages to try and move the crow[d]s" away from the area. Dkt. No. 41-5 at 2; Dkt. No. 26-1 at 3–4. Although Cheairs heard an order to disperse and had ample time to comply, he chose not to do so. Dkt. No. 41-5 at 2; Dkt. No. 28-1 at 19.[10] After Captain Brooks issued an order to deploy OC blast balls, Officer Anderson threw four blast balls from

---

[9] Cheairs does not dispute that protestors in the crowd threw fireworks and other dangerous projectiles at the police in the minutes before and after Officer Anderson's deployment of the blast ball which struck Cheairs, and the officers' BWV clearly shows this to be the case. *See, e.g.*, Dkt. No. 30-1 at 2 (02:05:30–02:12:00) (Officer Washington's BWV); *id.* at 3 (00:34:59–00:45:05) (Officer Oh's BWV).

[10] Cheairs does not argue that the dispersal orders were not warranted or that they were otherwise deficient in any respect. *See generally* Dkt. No. 41.

behind a line of other officers without any concomitant effort to apprehend or otherwise restrain any member of the crowd, including Cheairs. Dkt. No. 41 at 5; Dkt. No. 41-3 at 12–13; Dkt. No. 26-1 at 4–5; Dkt. No. 24 at 18. In his use of force report, Officer Anderson stated that he deployed the blast balls to create space between the police line and protestors and cause people to leave the area in accordance with the dispersal orders. Dkt. No. 26-1 at 4; *see also* Dkt. No. 24 at 19. Unlike the plaintiff in *Nelson v. City of Davis*, 685 F.3d 867, 875–76 (2012), Cheairs was not immobilized after one of these blast balls ricocheted and hit him, Dkt. No. 41-5 at 2; Dkt. No. 31-1 at 22–23. Indeed, he does not dispute the City's contention that his freedom of movement was not restricted by Officer Anderson's use of force. Dkt. No. 24 at 18. Furthermore, Cheairs was not stopped or arrested by any officer. *Id.*; Dkt. No. 44 at 8.

These undisputed facts do not objectively manifest an intent to restrain. Rather, they are entirely consistent with an intent to prompt the crowd to leave without attempting to apprehend or otherwise restrain anyone. Therefore, Cheairs has failed to rebut the City's showing that no seizure occurred. *See Jackson-Moeser v. Armstrong*, 765 F. App'x 299 (9th Cir. 2019) (affirming summary judgment for defendant officer on plaintiff's Fourth Amendment claim because the officer's baton strike against plaintiff as a line of officers was pushing protesters off a freeway, resulting in plaintiff running away without any officer telling her to stop or following her, did not show an unambiguous intent to restrain); *cf. Meggs v. City of Berkeley*, 246 F. App'x 402, 403 (9th Cir. 2007) ("The use of force to repel [plaintiffs] from the skirmish line is properly analyzed under the Fourteenth Amendment guarantee of substantive due process and not under the Fourth Amendment because it did not occur in the course of an arrest, investigatory stop, or other seizure." (quotation marks and citation omitted)).

*(b) Cheairs Has Not Raised a Genuine Dispute of Material Fact Precluding Summary Judgment on His First Amendment Retaliation Claim*

To prevail on his First Amendment retaliation claim under Section 1983, Cheairs must show that (1) he was engaged in constitutionally protected activity, (2) Defendants' conduct would chill a person of ordinary firmness from continuing to participate in the protected activity, and (3) the protected activity was a "substantial or motivating factor" in the Defendants' conduct. *See Index Newspapers v. U.S. Marshals*, 977 F.3d 817, 827 (9th Cir. 2020). If Cheairs makes a prima facie showing of retaliation, "the burden shifts to the defendant official to demonstrate that even without the impetus to retaliate he would have taken the action complained of[.]" *Hartman v. Moore*, 547 U.S. 250, 260 (2006). "If . . . retaliation was not the but-for cause of the [adverse action], the claim fails for lack of causal connection between unconstitutional motive and resulting harm, despite proof of some retaliatory animus in the official's mind." *Id.* In other words, "if the government officials would have taken the same adverse action even in the absence of their animus or retaliatory motive arising from the plaintiff's speech, then the officials' animus was not a but-for cause of the adverse action, and there was no violation of the plaintiff's constitutional rights." *Boquist v. Courtney*, 32 F.4th 764, 778 (9th Cir. 2022).

The City argues that Cheairs has not established a genuine dispute of fact as to the elements of a retaliation claim. Specifically, the City contends that (1) Cheairs was not engaged in free speech or other activity protected under the First Amendment because (a) he was not protesting or filming for journalistic purposes and (b) he was in violation of dispersal orders; and (2) even if he was engaged in protected activity, he has not produced evidence of any retaliatory animus against him or the crowd for any protected activity. Dkt. No. 24 at 21; Dkt. No. 44 at 9–11. Although Cheairs argues that the City violated his First Amendment rights by "deploy[ing] flash bang grenades indiscriminately against protestors such as [himself], who were not engaging in illegal or

threatening activity," Dkt. No. 41 at 21, he does not address the City's arguments that he was in violation of the dispersal orders and that he failed to show retaliatory animus, *see generally id.*

The First Amendment declares in part that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people peaceably to assemble[.]" U.S. Const. amend. I. This right embodies and encourages our national commitment to "robust political debate," *Hustler Mag. v. Falwell*, 485 U.S. 46, 51 (1988), by protecting both free speech and associational rights, *see, e.g., id.* (freedom of speech); *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460–61 (1958) (freedom of association). Thus, the First Amendment protects political demonstrations, protests, and the act of recording police officers conducting their official duties in public. *Boos v. Barry*, 485 U.S. 312, 318 (1988); *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1044 (9th Cir. 2018).

But First Amendment protections are not absolute. It is axiomatic, for instance, that government officials may stop or disperse public demonstrations or protests where "clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears[.]" *Cantwell v. Connecticut*, 310 U.S. 296, 308 (1940); *see also Cox v. State of La.*, 379 U.S. 536, 554 (1965). "[W]here demonstrations turn violent, they lose their protected quality as expression under the First Amendment." *Grayned v. City of Rockford*, 408 U.S. 104, 116 (1972). In turn, law enforcement may arrest those individuals who refuse to leave when ordered, as their failure to comply exacerbates the danger afflicting the city and hinders law enforcement's ability to secure the situation. *See Feiner v. New York*, 340 U.S. 315, 321 (1951) ("It is one thing to say that the police cannot be used as an instrument for the suppression of unpopular views, and another to say that, when as here the speaker passes the bounds of argument or persuasion and undertakes incitement to riot, they are powerless to prevent a breach of the peace.").

Consistent with these principles, a person is guilty of failure to disperse under Washington law if he "congregates with a group of three or more other persons and there are acts of conduct within that group which create a substantial risk of causing injury to any person, or substantial harm to property" and he "refuses or fails to disperse when ordered to do so by a peace officer or other public servant engaged in enforcing or executing the law." Wash. Rev. Code § 9A.84.020(1); *see also State v. Arreola*, 165 Wash. App. 1004, 2011 WL 5924542 at *3 (Wash. Ct. App. 2011) (a "substantial risk" is "an existing, real, or actual possibility of loss or injury"). Thus, "[w]hen clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears, the power of the State to prevent or punish is obvious." *State v. Dixon*, 479 P.2d 931, 938 (Wash. 1971) (interpreting the predecessor to Section 9A.84.020) (quoting *Cantwell*, 310 U.S. at 308); *see also id.* at 937 ("The basically democratic and explicitly constitutional rights of peaceable assembly and freedom of speech are not abridged by laws . . . which thwart the conduct of groups who, having lawfully assembled, formulate a purpose to breach the peace, or injure persons or property or do any other unlawful acts.").

In this case, Cheairs' First Amendment claim fails to survive summary judgment for two independent reasons: (1) he does not raise a genuine dispute as to whether he was engaged in constitutionally protected activity at the time of his injury, and (2) he does not raise a genuine dispute that such activity was a factor in—let alone the cause of—Defendants' conduct.

> (i) Cheairs does not dispute that he was in violation of a lawful order to disperse at the time of the adverse action

The undisputed evidence shows that Cheairs violated the order to disperse despite being given adequate notice and a fair opportunity to comply. Cheairs does not dispute that the SPD's numerous dispersal orders were audible to him and others, Dkt. No. 28-1 at 17; indeed, Cheairs

1   states in his declaration that as he approached the intersection, the "SPD began to broadcast

2   messages to try and move the crow[d]s," Dkt. No. 41-5 at 2. His own video records a dispersal

3   order issued 201.1 seconds prior to the impact by the blast ball. Dkt. No. 28-1 at 19. That order

4   stated as follows:

> . . . all those assembled at 11th and Pine to immediately disperse, which means
> leave this area. If you do not do so, you may be arrested or subject to other police
> action. Other police action could include the use of chemical agents or less lethal
> munitions, which may inflict significant pain or result in serious injury. If you
> remain in the area just described, regardless of your purpose, you will be in
> violation of city and state law. The following routes of dispersal are available:
> Westbound on Pine. Southbound on Twelve.

9   Dkt. No. 31-1 at 33 (00:01–00:41); *see also* Dkt. No. 26-1 at 25–26. Although Cheairs had over

10   three minutes to obey the order, he chose not to do so. Dkt. No. 28-1 at 19; Dkt. No. 41-5 at 2.

11   Additionally, Cheairs does not argue that the order to disperse was not warranted or was otherwise

12   unlawful. Dkt. No. 24 at 6; *see generally* Dkt. No. 41. He does not rebut the City's expert testimony

13   that Captain Allen gave lawful dispersal orders that evening. Dkt. No. 29-1 at 30–32. He does not

14   dispute that both before and after the above-quoted order to disperse, protestors were violently

15   attacking officers by throwing projectiles and shining lasers in officers' eyes, or that there was a

16   significant escalation in the violence of the crowd beginning at approximately 12:04 a.m. Notably,

17   Cheairs relies on his own videos and William Neale's montage of his videos together with the

18   BWVs of officers as accurately representing "[t]he events in question," Dkt. No. 41 at 3, and those

19   videos clearly corroborate the violence that precipitated the lawful dispersal orders, *see supra* at

20   7; Dkt. No. 29-1 at 24 (noting that rocks and several "missiles" were thrown at officers and lasers

21   were shined into officers' eyes in the six minutes before Cheairs was struck); Dkt. No. 24 at 7–8

22   (partial list of the projectiles and lasers visible on the video compilation). And finally, Cheairs

23   does not dispute that his failure to leave the area violated Section 9A.84.020 of the Revised Code

24   of Washington.

Considering the undisputed facts in the record, the Court finds that Cheairs has not established a genuine issue for trial regarding whether he was engaged in protected conduct at the time of the adverse action. *See Colten v. Kentucky,* 407 U.S. 104, 109 (1972) (holding that a plaintiff's "conduct in refusing to move on after being directed to do so was not, without more, protected by the First Amendment"); *Cervantes v. San Diego Police Chief Shelley Zimmerman*, No. 17-CV-01230-BAS-AHG, 2020 WL 5759752, at *7 (S.D. Cal. Sept. 28, 2020) ("Plaintiffs had no First Amendment right to remain in the area of a protest or riot after police issued an order to disperse and were violating the law by doing so."), *aff'd sub nom. Ramirez v. Zimmerman*, No. 20-56117, 2021 WL 5104371 (9th Cir. Nov. 3, 2021); *Hicks v. City of Portland*, No. CV 04-825-AS, 2006 WL 3311552, at *12 (D. Or. Nov. 8, 2006) ("Plaintiff had no protected First Amendment to enter the street in violation of a lawful order to disperse."). "Nor does existing case law establish, or even suggest, that the First Amendment prohibits law enforcement from enforcing a dispersal order under the circumstances present in this case." *Cervantes*, 2020 WL 5759752, at *8.

> (ii) Cheairs does not dispute that retaliatory animus was not a motivating factor in Officer Anderson's deployment of the blast balls

Even assuming that Cheairs was engaged in activity protected under the First Amendment, he fails to dispute the City's evidence that no retaliatory animus was behind the deployment of the blast balls. As an initial matter, Cheairs does not allege in his complaint that the SPD, or Anderson specifically, deployed the blast balls in response to anyone's protected activities. *See generally* Dkt. No. 1; *see also Boquist*, 32 F.4th at 777 ("[T]o establish the third prong of the prima facie case for First Amendment retaliation—which requires the plaintiff to show a causal relationship between the protected conduct and the material adverse action—the plaintiff must show that the protected conduct played a part, substantial or otherwise, in the defendant's wrongdoing" (cleaned up)); *Johnson v. City of San Jose*, 591 F. Supp. 3d 649, 665 (N.D. Cal. 2022). But even if Cheairs

had stated a claim for First Amendment retaliation, he does not present any evidence of retaliatory animus, nor does he make any effort to rebut the City's evidence that Officer Anderson threw the blast balls to protect the line officers, create space between officers and the crowd, and to disperse the crowd. *See* Dkt. No. 26-1 at 4; Dkt. No. 24 at 21; Dkt. No. 44 at 11; *see generally* Dkt. No. 41; *see also Nieves v. Bartlett*, 139 S. Ct. 1715, 1727–28 (2019) (affirming summary judgment on a retaliation claim because the record contained insufficient evidence of what motivated the arresting officer); *Cervantes*, 2020 WL 5759752, at *9 (finding that plaintiff did not establish the third element of his retaliation claim when he did not "submit any evidentiary support to raise a genuine factual issue about [the officer's] motivations").

Accordingly, as with his Fourth Amendment excessive force claim, Cheairs has failed to identify a genuine issue for trial with respect to his First Amendment retaliation claim.

2. Cheairs Cannot Establish *Monell* Liability

Because no constitutional violation occurred, there can be no *Monell* liability on the part of the City, and the City is entitled to summary judgment. *Yousefian v. City of Glendale*, 779 F.3d 1010, 1016 (9th Cir. 2015).[11]

---

[11] The Court denies Cheairs' improper request (raised for the first time in his opposition brief) for leave to amend his complaint "to cure any deficiency in the pleadings." Dkt. No. 41 at 15 n.2. The deadline to amend pleadings was June 30, 2022, roughly nine months before Cheairs filed his opposition brief. Dkt. No. 15. He makes no effort to show why that deadline could not be met despite his diligence. *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992) ("Unlike Rule 15(a)'s liberal amendment policy which focuses on the bad faith of the party seeking to interpose an amendment and the prejudice to the opposing party, Rule 16(b)'s 'good cause' standard primarily considers the diligence of the party seeking the amendment."). Nor does he explain why he did not move for leave to amend by the close of discovery, to the extent facts were not available to him until the discovery phase. There is accordingly no basis to permit leave to amend. *See id.* ("If th[e moving] party was not diligent, the inquiry should end."); *see also, e.g.*, *Seattle Pac. Indus., Inc. v. S3 Holding LLC*, 831 F. App'x 814, 816–17 (9th Cir. 2020) (party that moved for leave to amend three months after the amended pleadings deadline failed to exercise diligence because it could have asserted its proposed claims before that deadline); *Lockheed Martin Corp. v. Network Sols., Inc.*, 194 F.3d 980, 986 (9th Cir. 1999) (denying leave to amend where plaintiff's motion "came several months after the stipulated deadline for amending or supplementing the complaint" and "[n]othing in the proposed amended complaint relied on facts that were unavailable before the stipulated deadline").

### III.   CONCLUSION

For the foregoing reasons, the Court GRANTS the City's Motion for Summary Judgment. Dkt. No. 24. In light of the above, the status conference scheduled for April 29, 2024 at 1:30 p.m. is hereby STRICKEN. Dkt. No. 48.


Dated this 24th day of April, 2024.


Lauren King
United States District Judge

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 32